## BUFFALO GRAVEL CORPORATION v. GRAVEL PRODUCTS CORPORATION.

### No. 320.

Circuit Court of Appeals, Second Circuit.

Argued March 5, 1935.

Decided April 1, 1935.

John S. Powers, Harold I. Popp, and E. Bernard Gary, all of Buffalo, N. Y., for appellant.

Henry F. Wolff, of New York City, and George I. Haight, of Chicago, Ill. (Ward Ross, of Chicago, Ill., of counsel), for appellee.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

Appellant sells sand and gravel which it obtains by means of boats having equipment for pumping material from the bottom of Lake Erie, screening it, and returning overboard the water and rejected detritus. Two boats, which it used, have devices for this purpose which were found below to infringe appellee's patent. Appellee's patent No. 1,-729,070, applied for February 27, 1926, and granted September 24, 1929, is sued on (claims 16 to 25 inclusive, and 28, 29, and 30) and has been found to have been infringed by appellant.

The object of this invention is washing gravel and sand, and, at the same time, classifying the products into various grades or sizes. One of the principal advantages of the invention is the grading of the recovered material at the source of supply. Grading is referred to as a classifying operation with respect to the constituents of the conglomerate.

The invention is described as including two inclined chutes, one arranged directly over the other. At appropriate intervals, bar screens are arranged along the floor of the upper chute. The aggregate is delivered

by a pipe, connected with a suction pump to the upper end of the upper chute. The oversize and débris of the aggregate are swept on by the water current and at the lower end of the chute are suitably discharged overboard. The quantity of material which discharges through the screens is regulated by adjustable gates. The lower chute carries instrumentalities for grading the conglomerate which passes through the screens of the upper chute, the chute itself discharging the water, mud, and fine refuse. The different grades recovered are discharged into the cargo space at different points. The grading means consist of secondary screens and sand-settling boxes, the latter being used both independently of and in association with the secondary screens. The number of secondary screens and sand-settling boxes and their locations with reference to the chutes are optional, but where the sand-settling box or grading combination is used, its location will be under the bar screen of the upper chute. Separation of the coarser grades is done by the secondary screens, the gravel and stone passing over the screens into compartments in the hold, and the finer material passing through the screens and being directed by plates to the chute, the sand or grit being recovered by the settling boxes, and the water and suspended mud and silt being discharged overboard from the lower end of the chute. The settling box is valve controlled, its open bottom overlying the plate on which the sand comes to rest. The plate is normally held elevated by a weighted lever arrangement, and when the weight of the sand and water exceeds a predetermined degree, the plate lowers and permits the sand to discharge into the hold until equilibrium is restored. These operations are repeated indefinitely. The water in the lower chute is utilized to wash the sand which is recovered by the settling boxes. Preferably, the volume of water is augmented by an additional supply from a pump and a pipe which discharges into the chute.

The appellant's equipment has, in common with this Gerken patent, a long inclined chute provided at intervals with bar screens and with adjustable gates for regulating the volume of streams of conglomerate which pass through the bar screens; the material from which the separation is to be made being delivered to the upper end of the main chute by a suction pump and the oversize discharging from the lower end of the main chute and being returned to the water. It also has secondary screens located under the bar screens of the main chute and upon which the conglomerate falls, the gravel being scalped by the secondary screens falling into the cargo space. Likewise it has means located under the secondary screens for receiving the water and suspended fines and returning them to the water. Its means is an elongated chute located under the secondary screens as a series and extending in the same direction as the main chute.

Appellant's equipment, however, does not have sand-settling boxes as in the patent, nor any equivalent thereof, nor has it separating units, each composed of a secondary screen arrangement and a sand-settling box to act continuously on a unit stream of conglomerate falling through a screen of the main chute. Nor does it fractionate that stream into separate products, separately recovered. In the appellant's device, the screens are not available for interchangeable positioning, and, in its construction, a single elongated secondary screen is common to a series of screens in the main chute, whereas in the patent, a series of structurally independent secondary screens is provided; each screen, as a separate unit, being associated with but one of the screens of the main chute and being interchangeable in position with any of the other secondary screens.

The defense of prior use and lack of invention over the prior art is fully established. From 1898 to 1904, inclusive, a Captain Gamble used a sandsucker ("R.A.Burton") of the flush deck type on Lake Erie, having in her equipment a chute running lengthwise of the boat, with screens at suitable intervals in its floor; these being controlled by shutters. Material from the lake was pumped to the upper end of the chute and carried along by the force of the water, the oversize being returned to the lake and the conglomerate falling through the screens into the cargo box on deck. The Gerken patent recognized the old "single trough" in its specifications. In the "Burton," added equipment consisted of two inclined secondary screens for sand and gravel located, respectively, under the first two screens of the long chute and an inclined cross chute located under each secondary screen. The conglomerate from the first two screens of the long chute fell upon the secondary screens and the gravel was scalped and fell from the ends of the secondary screens into a cargo box at one side of the central bulkheads. The sand and water which passed through the secondary

screens fell into the inclined cross chutes and were delivered into a cargo box on the opposite side of the central bulkhead. The water escaped through the deck scuppers. Secondary screens were hung by chains from the main chute and the cross chutes were hinged to the frames of the secondary screens. This equipment could be removed from the main chute and stored away with each cross chute folded upon the frame of its companion secondary screen.

Gerken testified to having used secondary screens for the separation of gravel on the "Excavator," and acknowledged that this "was Captain Gamble's scheme," and there was testimony that Gerken installed equipment "practically the same as Captain Gamble's."

The one point of difference between the Gerken structure and Captain Gamble's, in respect to the features common to both Gerken's and appellant's structure, is a means for carrying away water and fines as a continuous lower chute; but this is found in the prior art. British Patent to Wilkerson, 25,-825 (1913). Wilkerson's specification described this construction as relating "to that class of apparatus for screening, grading and washing gravel, sand and the like comprising a series of screens of different mesh so arranged that the material passes from one screen to another and the graded material is delivered from the respective screens." Wilkerson's patent shows a continuous lower chute parallel to, and beneath, a main chute, common to all the secondary screens and serving as a discharge flow-way for the water and rejected fines. It shows, with exactness, and as a part of the same general combination for the same purpose of washing and grading sand and gravel, the one feature by which the patentee purports to distinguish his construction from Captain Gamble's and to involve appellant's construction.

The patent to Thompson (No. 1,149,989, August 10, 1915) shows equipment for separating, washing, and grading sand and gravel. There are gravity screens and associated chutes, and it assumes the use of water to aid the flow of material as well as the separation. The operation is described as in the aggregate a "method of separating, grading and washing material without the utilization of mechanical agitating mechanism and dependent upon hydraulic principles as pertaining to volume and velocity of flow of the aggregate, this being obtained by the proper regulation of the angle of inclination of sluices in relation to the volume of water used * * * and comprising the deflection of rock from a mass of sand and gravel; separation of gravel from sand; and successive grading of separated sand and gravel by the operation of gravity and water operating over inclined flumes and screens in continuous flow * * *." It describes the treatment of the material and the operation desired with the same result as does Gerken.

The patent to Hoyt, No. 1,064,223 (June 1913), relating to the art of separating metals from metal bearing sands, involves the same principle of operation provided for by Gerken.

Appellee asserts that the patent in suit has distinguishing functions and advantages independent of the settling-box feature. Comparing the utility of the simple combination of the two chutes and the primary and secondary screens with the equipment of the prior art, it will be found that they have been anticipated. Claims of the patent which call for shutters in association with primary screens as elements of the combination are not novel. Shutters for the same purpose go back to the beginning of the art. Captain Gamble used them on the "Burton." Such use of shutters was said to be "elementary." Shutters in the patented art go back to Schultz, No. 174,981 (March, 1876). Trimming of the boat by means of shutters under the primary screens was not an advantage new to this patent.

The function of appellee's secondary screens was to remove sand from the gravel. Evidence offered as to the removal of sand by the secondary screens indicates that removal of a percentage of sand from the conglomerate which passed through the primary screens was not an advantage new to the patent in suit. Wherever secondary screens have been used in connection with sand and gravel operations, that has been their function. The sole purpose of their use is to separate sand from gravel. Captain Gamble's equipment made such use of them.

It is said that the lower chute provided for in the patent, with the use of settling boxes, cleans the sand. There was nothing new in such use of the lower chute or its use as a separating plant to carry the fines to a different point of delivery from the gravel and as keeping up the kinetic energy

of the water received from the upper chute, and its utilization to wash the fines away.

The high velocity of water in the main chute, upon which emphasis is laid, was very well known in the gravel business. No advantage can be claimed for the velocity of water in the main chute and its effect upon washing the gravel as it flows over the secondary screens. The flow of water along the lower chute, carrying the worthless fines in suspension, presented no new problem, and, because objects may be washed more efficiently with clean water than with muddy water, as proposed by the patentee in using cleaner water in the lower chute, it in no way attributes inventive thought in the construction of this equipment.

But it is suggested that the evidence concerning separated stone shows superior utility of the combination; that is, the upper and lower chutes and the secondary screens. But separated stone is not a new product. Captain Gamble, with his apparatus, obtained gravel with the sand taken out of it.

The claims of the patent in suit may be grouped as: First, comprising those which broadly provided means for carrying away the water and fines which fall through the secondary screens (claims 16, 20, 21, 22, 23, 24, 25, and 30); second, the claims which specifically call for an inclined lower chute with features common to both Gerken's and appellant's equipment (claims 17, 18, 19, 28, and 29). The claims of the first group were anticipated as above indicated, and the claims of the second group were void for want of invention. It is not invention to select and put together desirable parts of different machines in the same art where each operates the same way in the new machine as it did in the old and effects the same result. Concrete Appliances Co. v. Gomery, 269 U. S. 177, 46 S. Ct. 42, 70 L. Ed. 222; Grinnell Washing Machine Co. v. E. E. Johnson Co., 247 U. S. 426, 38 S. Ct. 547, 62 L. Ed. 1196; Muser v. Bell (C. C. A. 2) 278 F. 904, 910; Huebner-Toledo Breweries Co. v. Matthews Gravity Carrier Co., 253 F. 435, 447. "Neither the combination of old elements or devices accomplishing no more than an aggregate of old results * * * nor the use of an old apparatus or appliance for a new purpose * * * is invention." Powers-Kennedy Contracting Corp. v. Concrete Mixing & Conveying Co., 282 U. S. 175, 186, 51 S. Ct. 95, 99, 75 L. Ed. 278.

Decree reversed.