**FRICK et al. v. CRISP.**

No. 7731.

District Court, E. D. New York.

April 23, 1936.

Martin Gottlieb, of New York City, for plaintiffs.

Eggleston & Vander Clute, of New York City (Howard P. King, of New York City, of counsel), for defendant.

BYERS, District Judge.

In this cause in equity, the plaintiffs allege that the defendant infringes patent No. 1,896,774 for a "liquid atomizer." The device is a metal oil burner, in which fuel oil is broken up into a mist so as to be ignited.

The plaintiff Frick is the patentee, and the corporate plaintiff holds the exclusive license to make, use and sell throughout the United States.

The defendant Crisp was formerly the vice-president of the corporate plaintiff, and when engaged in its business he met the patentee who was the chief engineer on an oil-burning vessel; the latter had encountered problems in the operation of the Coen device (hereinafter discussed) with which his vessel was equipped, and had conducted experiments for some time in the effort to overcome difficulty with smoke and to devise something less expensive in replacement because the burners wore out quickly.

Frick was successful in his efforts, showed his model to the defendant Crisp, and suggested that he adopt burners like it, and sell them as a side-line to his soot blower which he was then marketing.

To this Crisp soon agreed, and delivered Frick's model and drawings to his own patent attorney, who prosecuted the application for Frick and obtained the patent in suit. That is, drawings were sent to the corporate plaintiff, and on May 15, 1931, Crisp signed a letter as vice-president, acknowledging their receipt, reciting that his company was given authority to authorize search to determine patentability, and that if "patents are obtained they are to be the sole property of the patentee."

On July 15th the license agreement was signed, and constituted the Engineers Supply Company, Inc., the exclusive licensee. Application was filed July 27, 1931, and the patent was issued February 7, 1933.

The licensee has caused to be manufactured from 8,000 to 10,000 of the burners, and has paid Frick royalties of from $1,-500.00 to $2,000.00, from which commercial success may be deemed to have been established and is accordingly found.

Crisp left the licensee's employ in January, 1935, and immediately embarked upon his own venture, which includes the sale of the device alleged to infringe.

The questions for decision are validity and infringement.

As to the latter, it may be said that the devices are substantially similar. The slight variation requires brief explanation:

The burners are of two members, and assembled are about 1 to 1¼ inches in height and of a diameter of about ¾ of an inch below a collar having a knurled surface to permit of engagement with the oil supply pipe. The two parts called the cap and the plug are held in engagement by screw threads; that is, the plug is screwed into the cap. The latter is cylindrical to a depth of about ½ inch below the collar, and the threads upon its interior engage the threads of the plug.

On opposite sides, this cylinder is cut away to a depth of ⅝ of an inch or more, the openings having a width of about ¼ of an inch. These openings are oil channels, and when the burner constitutes the end of the oil pipe to which it is affixed, the oil flows through them toward a circular chamber (called the whirl chamber) in the interior of the assembled burner, having parabolic sides tapering toward a small circular aperture at the end, through which the oil emerges as a fine spray.

· Entrance to that chamber is had through two or more slots which are intended to register with the channels, and are cut in the upper part of the plug; the interior exit of those slots impinges upon the annular conical portion of the inner wall of the cap; this relation of the slots to the interior construction of the cap completes the passageway for the oil from the said channels to the whirl chamber.

These slots are tangential to the periphery of the base of the chamber so that the course of the stream of oil is toward the upper aspect of the chamber opposite the point of entrance, rather than directly across the center of the chamber at the level of the outer end of the slots, which would be the case if the slots were radially disposed, and did not incline as shown in the drawings.

The stream of oil thus is thrown around the interior of the chamber, and outward, due to the shape of the walls, and pressure, and so emerges through the aperture, not as a stream but as a spray or mist partially volatilized.

The differences in the structures are two: (a) The defendant's has a collar or flange below the entrance slots which have been described, so that, as the oil flows through the channels, it needs to pass through these lower slots before entering those which conduct it to the chamber. These lower slots are tangential to the flange which contains them, and run counter to the upper ones leading to the chamber.

The defendant makes no point that this element of his structure avoids infringement, and plaintiffs' testimony, which is not disputed, shows that the lower set of slots do not promote but probably tend to retard operability. They may have been added to lend visual confusion, but they do not otherwise avoid imitation of the plaintiffs' device.

Examination of the issue of infringement must proceed without reference to them.

(b) The conformation of the entrance slots is said to be different in the two structures, in that the plaintiffs' are deeper at their outer extremity than at the entrance to the whirl chamber, while the defendant's are uniform throughout.

This draws attention to the two claims, which are:

"1. A liquid atomizer consisting of a cap and plug, the cap having longitudinal cut away portions forming recesses extending inwardly from the rear end of said cap and said cap being formed with a central discharge orifice and also formed with a whirl chamber at the rear of said orifice and an annular seat around said chamber, and said plug having at its inner end a plurality of straight tangential slots which with said seat form inwardly tapering passages communicating with said whirl chamber the outer ends of said passages communicating with said recesses when said plug and cap are assembled.

"2. A liquid atomizer consisting of a screw cap and plug, the cap having longitudinal cut away portions forming recesses extending inwardly from the rear end of said cap and said cap being formed with a central discharge orifice and also formed with a parabolic whirl chamber at the rear of said orifice and an annular seat around said chamber, and said plug having a relatively blunt inner end and having at its inner end a · plurality of substantially transverse straight tangential slots which with said seat form inwardly tapering passages communicating with said whirl chamber the outer ends of said passages communicating with said recesses when said plug and cap are assembled."

The defendant argues that the expression in claim 1 concerning the slots, which says "a plurality of straight tangential slots which with said seat form inwardly tapering

passages * * *," means for instance that the slots alone are tapered, because they are deeper at their outer or peripheral end, than at their inner or whirl chamber end.

It is not thought that the claim requires that interpretation. The quotation should be read with lines 15 to 28, 76 to 84, and 94 to 99 of the specifications. The latter particularly emphasize that the liquid (after entering the slot) "then tapering flows inwardly through passages formed by the slots 21 and the seat 22 of the cap 10 from which it discharges in tangential directions into the whirl chamber 18."

The dual constituency of the passages is thus shown to consist of the slots and the annular seat of the cap. Together they form the tapering passage described in the claim. The patentee has thus associated them, and the defendant is not at liberty to dissolve the combination to serve his own purposes.

The plaintiff testified that, as an incident of manufacture, the slot itself is tapered, thus: "In the manufacture, the milling cutter has to clear the inside. If it is a straight slot, that would be a difficult, expensive thing to slot. By tapering the slot, the milling cutter clears the opposite side and at the same time you get the nozzle effect."

It is to be noted that the slot is straight in the lateral sense, and the use of the word by the plaintiff is understood to refer to the bottom of the slot only.

The defendant insists that the slot in his device is of uniform depth and he asserts that thereby he has deliberately avoided infringement. The fact as testified to will be assumed, although it is not deemed to be free from doubt in the light of conflicting testimony offered for plaintiff.

As presently understood the patent does not teach a slot of varying depth, and the plaintiffs' explanation of the milling operation is not to be confused with that. The slots are so short that a powerful glass would probably be required to reveal anything of substance in this aspect of the case.

It is found that the defendant's structure so closely resembles that taught in the patent, and embodied for instance in Plaintiffs' Exhibit 3, that infringement has been shown.

Turning now to the question of validity, it should be said that the plaintiff claims novelty and invention for a new combination of elements which were old in the art. The opportunity for the exercise of inventive faculty was thus much restricted and must be clearly shown if plaintiff is to succeed.

The defendant relies principally on the Coen patent No. 1,180,907 granted April 25, 1916. Before considering that in detail it must be recalled that it was a Coen burner which was in use upon the ship of which the plaintiff was chief engineer, that functioned unsatisfactorily and led to the plaintiff's experiments which resulted in his obtaining his patent.

As to the superiority of the Frick burner over that of Coen, the defendant is the plaintiff's best witness, thus:

"Q. But in any event when he (plaintiff) told you about his own device you recognized the advantage over the Coen device, did you? A. I did, yes.

"Q. What was that advantage? A. Gave more efficient fuel performance."

The last expression is understood to mean that more complete combustion (i. e. less smoke) was obtained from the use of the Frick burner.

The applicable rule according to which this patent must be tested, in light of the foregoing, is thought to have been stated by Lurton, J., in National Tube Co. v. Aiken (C.C.A.) 163 F. 254, at page 261, in this language: "So if a new combination and arrangement of old elements produces a new and beneficial result, as to greatly increase the productive efficiency of a machine, it is evidence of invention." Citing cases among which is Webster Loom Co. v. Higgins, 105 U.S. 580, 26 L.Ed. 1177.

The Coen patent is for a liquid atomizer or spraying device particularly adapted for use in oil burners. It discloses a conical whirl chamber from which the liquid emerges as a spray, and entrance thereto is had through slots which are tangential to the circular walls of the chamber and which penetrate them; entrance to these slots is controlled by slots in a sleeve, which register with the entrance slots, whereby the volume of oil to be volatilized in the chamber is controlled depending upon the size of the flame desired. The oil approaches from a supply pipe as in the Frick patent, and makes a right angle turn into the entrance slots which convey it to the whirl chamber.

The first difference to be noticed between the devices lies in the fact that in Frick's a right angle turn is avoided, the course apparently being about half of that, so that entrance into the slots is accomplished by less pressure than in the Coen device; prob-

ably also the flow is more uniform and less likely to cause fouling.

In the absence of direct testimony that the Frick burner yields more complete combustion than Coen's, it would be difficult to ascribe anything in this connection to the former, but a choice of routes for the oil to follow; that, however, coupled with the results indicated, may be sufficient to resolve so close an issue. Coen's assertion of invalidity against Frick, if the former's patent were extant, would of course command more sympathy than Crisp's, for reasons indicated in the factual recital, and others appearing in the testimony.

A comparison between the Coen and Frick burners shows that in the latter the oil not only follows a more direct route from the end of the channel into the whirl chamber, but also is projected into the latter from the passage composed of the slot and the seat of the cap as though from a nozzle; it is possible that the added force which is expended against the opposite side of the whirl chamber is sufficient to account for the more complete diffusion of the liquid into the spray or mist which yields the result of more complete combustion from the Frick than from the Coen device.

If that be the explanation of what is the demonstrated superiority of the device of the patent, over its closest predecessor in the art, it may be plausibly argued that invention rather than mere mechanical dexterity was brought into play by Frick.

Sight has not been lost of the action of the Patent Office on August 5, 1932, which resulted in the striking of claim 2 as filed, and in which it was said " * * * it is not invention to form the tangential inlet port with a taper after the teaching of Muller."

Claim 2, as abandoned by reason of the foregoing, referred to "means forming straight passages, tapering toward their discharge end and discharging" etc.

Claims 3 and 4 as filed were allowed, and became claims 1 and 2 of the patent.

The formation of the inwardly tapering passages, as defined in claim 1, has been heretofore discussed, and the two components as so disclosed adequately account for the disallowance of former claim 2, and the allowance of 3 of the application, which is claim 1 of the patent.

Coen teaches nothing of this kind in reference to the slots of his device, and nothing else is shown in the art as reflected in any of the other patents cited by defendant

to deprive the plaintiff of his claim to originality of conception.

Dornfeld, No. 532,541 (January 5, 1895) covers a spraying nozzle "for reducing liquids into spray for cooling, disinfecting, and other purposes." The nozzle contains a chamber, which holds a loose plug having an eccentrically grooved surface. The water moves in these grooves which are V-shaped to admit of ready self-cleaning when the water pressure is alternately raised and lowered. There is nothing taught of the matters here involved.

Other patents cited by defendant, and not clearly analyzed, contain among them certain of the elements shown in Frick, but the combination therein employed has not been identified in the art as portrayed by defendant.

It is not thought to be sufficient to select a slot from one burner, and a cone shaped plug end from another, or a parabolic chamber from a third, and from those elements demonstrate that Frick's combination did not involve invention, in face of the testimony which has been quoted concerning the greater degree of combustion accomplished from its employment.

That testimony is thought to distinguish this case from Buffalo Gravel Corporation v. Gravel Products Corporation (C.C.A.) 76 F.(2d) 756, 759. In that opinion it is stated: "It is not invention to select and put together desirable parts of different machines in the same art where each operates the same way in the new machine as it did in the old and effects the same result." (Citing cases.)

As applied to this controversy, that rule does not aid the defendant, for no one old device or machine is relied upon, save the Coen burner, and the defendant's testimony is clearly that Frick's burner does not effect "the same result" as that, but a different one, namely, more complete combustion.

Crisp pays the customary deference to the prior art which is conventionally found in such cases, but his burner does not copy any but Frick's. Had he selected any other as his pattern, his contentions would be more persuasive.

The true inquiry is whether Frick employed more than mechanical ingenuity in designing his device, and, while opinions may well differ on that issue, it is thought that the presumption of validity which attaches to the patent has not been overborne,

and it is concluded that plaintiffs' patent is valid.

Decree for plaintiffs, to be settled on notice.

If the foregoing is not deemed to be a sufficient compliance with Equity Rule 70½, 28 U.S.C.A. following section 723, findings and conclusions may be settled at the same time as the decree.