## GENERAL MACHINERY CORPORATION v. CLEARING MACH. CORPORATION.

### No. 6330.

Circuit Court of Appeals, Seventh Circuit.

Sept. 28, 1938.

Greer Marechal, of Dayton, Ohio (Harry W. Lindsey, Jr., of Chicago, Ill., of counsel), for appellant.

J. H. Jochum, Jr., and Henry M. Huxley, both of Chicago, Ill., for appellee.

Before EVANS and TREANOR, Circuit Judges, and LINDLEY, District Judge.

## TREANOR, Circuit Judge.

Appellant is plaintiff below and is the owner of the Byerlein patent in suit, No. 1,827,558, issued October 13, 1931. The plaintiff's bill of complaint charged infringement of the Byerlein patent and for its charged infringement relies upon claims 7, 9, 18, 19, and 21 of the patent. The defenses were the invalidity of the claims and non-infringement of Claim 21, defendant admitting infringement of Claims 7, 9, 18 and 19.

The District Court ordered dismissal of the plaintiff's bill for want of equity.[1]

Plaintiff urges that the District Court erred in holding, (1) that the claims of his patent had been anticipated by claims of earlier inventions; and (2) that there was no invention over the Henderson Patent; and (3) that claim 21 of the plaintiff's patent was not infringed.

The patent in suit relates to an improvement in a particular species of presses known as "power presses."

There has been a special development of these power presses in connection with the automobile industry for the purpose of "drawing" from sheet metal, at one operation, an entire section of an automobile body, or of an entire fender, or similar portion of automobile structures. These presses comprise two large dies which are designed to draw the sheet metal into the desired form, such as a fender or a panel of the body portion. The lower die is mounted upon the bed of the press and the upper die is carried by a plunger which is moved down toward the lower die by appropriate mechanism. The sheet of metal that is to be shaped is placed on the lower die so that when the plunger carrying the upper die descends, the sheet metal is drawn into the desired shape.

The dies vary in dimensions and when very high dies are used the space between the upper plunger and the bed must be as much as six or seven feet. Consequently, if a particular power press is used for different jobs requiring dies of different heights, it is necessary to use some device, or arrangement, to compensate for the shut-height of the particular press, the shut-height being defined as the distance from the top of the bed to the slide when the stroke is down and the adjustment of the slide is up. There was evidence that the length of the adjustment of the slide varied from a few inches to 30 inches. Another method to compensate for the shut height was "to fill or 'pack up' the space between the bed and the slide member by the means of metal plates or 'ring risers' which are usually constructed so as to have generally the same outside dimensions as the bed, and having an opening through them which matches the opening in the bed."

---

[1] The following oral opinion was delivered by the District Court:

"It would serve no useful purpose to attempt to try to review the evidence in this case. It may be sufficient for the Court to give its conclusion. In my opinion anticipation is apparent, obvious and manifest. Henderson pioneered in this field and the patent in suit only improved, perhaps, but no new invention. The elements in the patent in suit are taken from the Fisher, Landin, James, Hawkins and others, work on the same principle, only in a different manner. Claim 21 is not infringed. It seems that the defendant's machine has the same principles but functions in a different manner. Therefore, the bill will be dismissed and you may draw your decree accordingly.

"Approved and ordered filed this 8th day of February, 1937."

Specifications in the Byerlein patent provided for a press having an adjustable bed which is supported for easy and quick adjustment and which is provided with adjusting mechanism constructed to insure uniformity of adjustment of all parts of the bed. The press illustrated in the Byerlein application has a frame or stationary part which comprises a stationary base, slide frame members or uprights, and an arch member, these members being rigidly held together in fixed positions by any suitable means such as tie rods. As is usual with power presses the metal to be worked is placed below the slide member or plunger on a suitable bottom die, and is operated upon by a die carried by the plunger; and the lower face of the slide member is therefore so constructed that an upper die or punch may be secured thereto for movement with the slide member.

In a summarizing conclusion in its brief the appellant states that the claims under the Byerlein patent "are narrowly directed * * * to the specific driving mechanism for adjusting the heavy bed-press up and down over a wide range, so constructed as to give symmetrical and uniform drive adjustment"; claim 19 "specifying the particular arrangement of this driving mechanism in pairs in the rigid subframe," and claim 21 "particularizing still further to include the relative arrangement of tie-rods and adjusting screws in respective transverse planes * * *"

As stated above the plaintiff for its charge of infringement by presses of defendant's construction relies upon claims 7, 9, 18, 19 and 21 of the Byerlein patent. The defendant contends that the 5 claims relied upon by plaintiff are invalid in view of the prior art and that claim 21 is not infringed. More specifically the defendant contends that the claims of the Byerlein patent are anticipated by the prior art as discovered in the Henderson, Fisher, James, Landin, Coffey, Hawkins, Glasner, and Hanson patents; and urges that the claims of the Byerlein patent distinguish from the prior art only in matters within

the mechanical and engineering skill of the calling.

Claim 4 of the Byerlein patent is not relied upon by the plaintiff, but we think it will be helpful to our discussion to note the scope of this claim. The claim reads as follows: "In an apparatus of the character described adapted for working metal, a frame, a bed adjacent a lower portion of the frame and adapted to have a lower die rest upon it, a plurality of screw supports therefor carried by said frame and constructed to symmetrically support said bed in said frame, and means for concomitantly rotating said screw supports to effect adjustment of said bed." It is clear, as contended by the defendant, that the gist of the Byerlein invention is set forth in claim 4. When claim No. 9 is compared to claim 4, we find that it is a more detailed statement of the general terms of claim 4 and that "plurality of screw supports" in claim 4 appears as "four screw supports" in claim 9. It is also specified in claim 9 that the four screw supports are adapted to support the corners of the bed and that the "means for concomitantly rotating said screw supports to effect adjustment of said bed," is an actuating mechanism comprising "a symmetrical drive to said screw supports from said sources of power for uniformly actuating each of said screw supports to effect adjustment of said bed."

The trial court found that the Byerlein patent did not constitute a new invention over the Henderson patent.[2] The Henderson patent described an adjustable bed which was adjustable by means of two screws one of which is located at each end of the bed, the screws being caused to revolve simultaneously and thereby moving the bed, or girder-table, up or down "according to the way the screws are turned into or out of the nuts," which are secured under each end of the bed, the nuts being supported upon the screws which are screwed into them. The screw actuating mechanism is substantially as follows: "At the lower end of each screw is fixed a worm-wheel, actuated by a worm, fixed upon a shaft, carried in bearings, attached

---

2 The following statements are found in the Henderson application:

(1) "My invention relates to power pressing machines for forming cornices, metal moldings, or making bends in sheet metal.

(2) "I also provide means for elevating or depressing the table, so a nice and close adjustment may be made of the dies to the work and to enable different heights of dies to be used, the table being operated by power at the will of the operator."

to the inside of the frames, collars being on the shaft to adjust any end movement of the shaft, the shaft connecting the two worms and reaching outside of frame, where a pulley is attached, this arrangement of parts causing the screws to revolve simultaneously when the pulley and shaft are turned, and the girder-table will consequently be moved up or down, according to the way the screws are turned into or out of the nuts, the girder-table going up or down parallel and true." The girder-table, or bed, in the Henderson press was long and narrow and required only two adjusting screws. While the particular mechanism illustrated in the specification comprised only two adjusting screws, the scope of the patent was not limited by this device; and any intention to so limit it is expressly negatived by the following reservation: "Having now described the mechanism I at present employ, and having so illustrated it that those skilled in the art can thoroughly comprehend it, I hereby reserve the right to such variations of construction as will be comprised within equivalent mechanism and that accomplish practically what I have set forth."

Under the Henderson patent there is no limitation upon the size of the girder-table, or bed, and consequently, if it were thought desirable to construct a press with a bed deeper from front to rear than the one described in the application and to use four adjusting screws with the necessary changes in the power mechanism, such change would come within the reservation of the right "to such variations of construction as will be comprised within equivalent mechanism and that accomplish practically" what was set forth in the illustration.

Evidently the trial court concluded that the adjusting mechanism of the Byerlein patent is only a variation of the construction described in the Henderson patent and constitutes an equivalent mechanism.

As disclosed above in the quoted statement of the plaintiff the claims under the Byerlein patent are "narrowly directed to the specific driving mechanism for adjusting the heavy bed up and down over a wide range, so constructed as to give a symmetrical and uniform drive adjustment." It is the driving mechanism which constitutes the substance of the claimed invention, and it is the defendant's contention that the driving mechanism of the Byerlein patent differs from that of the Henderson only in respect to mechanical changes which were well known and practiced by those skilled in the art and which are found in patents prior to the Byerlein.

The adjustable bed of the Byerlein patent is supported by four screw members. At the lower end of each of the screws there is a bevel-gear which meshes with a cooperating pinion placed at the end of a shaft. Each of the bevel-gears at the lower ends of the two screws on the front side of the adjustable bed meshes with a pinion carried at the end of a connecting shaft which is parallel with the front line of the bed; and the bevel-gears of the pair of screws at the rear of the adjustable bed likewise mesh with cooperating pinions carried at the ends of a shaft which is parallel to the first shaft. Each of these shafts carries a miter gear centrally mounted and each of these gears is engaged by a miter gear which is carried at the end of a connecting transverse shaft. The transverse shaft in turn carries a spur gear which is mounted equidistant from the end miter gears. Mounted directly above the transverse shaft is the driving shaft of the adjusting mechanism which carries a pinion which in turn meshes with the spur gear on the transverse shaft. The driving shaft is suitably connected with a motor. By the foregoing arrangement "a symmetrical drive for the adjusting mechanism is obtained."

The pair of primary shafts which directly actuate the screws, which in turn rotate and elevate or depress the adjustable bed, are suitably "mounted for rotation in any convenient manner,—for example in brackets depending from the frame or in the frame itself."

The Henderson patent provides for a long and narrow bed which is supported at the ends by screws, at the lower ends of which are gears which are engaged by suitable worm-gears on a power driven shaft. When the power shaft is revolved the gear worms engage the gears at the foot of the screws causing the screws to revolve simultaneously, "and the girder-table (bed) will consequently be moved up or down according to the way the screws are turned into or out of the nuts, the girder-table going up or down parallel and true." Since the mechanism illustrated in the Henderson patent is used for a long narrow bed and utilizes only two rotating screws, it is practicable to actuate these

screws directly by a drive shaft by providing a pair of worm gears on the drive shaft and mounting the drive shaft in such relation to the gears at the lower ends of the rotating screws that the worm gears of the drive shaft mesh with the gears of the rotating screws.

If the use to which a Henderson press is put should require a die of such dimension that the narrow bed illustrated in the patent would be insufficient to accommodate it, it would seem to be an obvious mechanical adjustment to widen the bed and use four supporting screws, one at each corner of the enlarged bed. This would necessitate the use of a pair of primary shafts, as in the Byerlein patent, with suitable gearing and shaft connection with the source of power. These changes do not involve invention, but if they did, the particular type of arrangement which has been used in the Byerlein patent is found in a number of power presses described in patents prior to the Byerlein patent.

The James patent (W. C. James Patent 368,672, 1887), which relates to machines for cutting leather, utilizes a bed adjusting mechanism which comprises four vertical screws which have bevel-gears at the lower ends which engage other bevel-gears at the end of a pair of primary shafts which directly rotate the screws, the rotating motion of the screws, which are properly mounted in relation to a cutting block, furnishing vertical adjustment of the block.[3] In the James mechanism the drive shaft from the source of power is mounted above the pair of primary shafts and at

right angles to their vertical planes and carries two worm-gears which are so placed on the drive shaft that each of these gears engages a cooperating gear which is carried by each of the primary shafts. As already noted above, the Byerlein mechanism carries what we denominated a transverse shaft which connects with the primary shafts and which is in turn connected with the drive shaft.

The Fisher patent (Patent No. 211841, 1879) relates to a leather cutting machine and states that the "invention consists in the peculiar construction and arrangement of the block supporting and adjusting devices, as hereinafter more fully specified." The cutting-block of the Fisher patent is supported by four adjusting screws each of which carries a gear nut which meshes with a single central spur gear from which a vertical shaft extends to beneath the frame, the vertical shaft being provided with a hand wheel, by means of which all of the screws can be operated simultaneously, up or down, for adjustment of the cutting-block.

The Coffey patent (Coffey patent No. 1564828, 1925) relates to a "Drop-pit mechanism for unwheeling locomotives." It is material to the present question because the patent discloses the use of a lifting frame which comprises an elevating and depressing mechanism which utilizes four supporting and actuating screws with an arrangement of gears and shafts substantially the same as the arrangement of the Byerlein patent.[4] Each of the load carrying screws carries a worm wheel which meshes with a worm mounted at the end of

---

[3] "The cutting-block is vertically adjustable in the usual manner, the block proper being generally of wood and resting upon a horizontal metallic plate * * * to the under side of which are secured, near each end thereof, vertical screws * * * the lower ends of which pass through threaded holes in horizontal bevel-gears * * * which engage with other bevel-gears * * * on the parallel horizontal shafts, each of which shafts has two such gears * * * and one worm wheel, which engages a worm, secured to a horizontal shaft, arranged at right angles to the shafts, and supported in the frame and provided with a crank and hand-wheel, by means of which said shaft may be turned to adjust the block to the cutting-edges of the die or knife when the head is in its lowest position."

[4] "Rising from and rigidly attached to four corners of the trolley are four load

carrying screws, each having threaded thereon a worm wheel meshing with a suitable worm enclosed in an oil or grease retaining case. The worms are connected together in pairs by shafts each carrying a bevel pinion meshing with another bevel pinion. These two last mentioned pinions are on a common shaft carrying a gear driven by a pinion on the shaft of an electric motor or other suitable source of power receiving its energy from a source not shown outside the machine. Each two cases over a given track rail are rigidly connected to box girders * * * made * * * of spaced channel irons. Each two cases which are opposite each other transversely of the track are connected together by cross beams rigidly secured in position by any suitable means * * * suitably secured to these cross beams and the adjacent channels of the box girders * * *."

each of a pair of parallel shafts, each of the parallel shafts carrying a bevel-pinion centrally located which in turn meshes with another bevel-pinion. The last mentioned bevel-pinion is carried at the end of a transverse shaft, which connects the primary shafts, the end pinions of the transverse shaft meshing with the bevel pinions carried by the primary shafts. The transverse shaft carries a gear which is engaged by a pinion on a drive shaft which is connected with the source of power.

The Landin patent[5] (Landin Patent, 1,496,274—1924) describes a mechanism for cutting out articles from sheet material and the invention "relates to a mechanism for cutting out articles from sheet material by means of dies." The mechanism to which the patent relates comprises power operated presses with an adjustable bed, supported and adjusted by four screw members which are simultaneously operated by suitable gearing and shafting for the purpose of adjusting the bed, or cutting-block, vertically. Only one primary shaft, which is mounted lengthwise of the bed and at right angles to the transverse plane of each pair of screws, is utilized to directly actuate the adjusting screws. This is accomplished by the use of two spiral gears mounted at the ends of the primary shaft which are large enough to mesh with the spiral gears mounted on each of the two screws which depend from each end of the table or bed. The primary shaft carries a bevel gear, centrally placed, which meshes with and is driven by a bevel gear on the drive shaft which is mounted at right angles to the primary shaft and connects with the source of power, the source of power described as being a hand wheel.

Plaintiff's claims 9, 18 and 19 are limited to the adjusting mechanism, including the four rotatably mounted screws, the interconnected gearing and the means for driving of the gearing to adjust the bed vertically.

Claim 9[6] does not describe any element or function not covered by the Henderson patent. The screw support element of the adjusting mechanism is present in both, performs the same functions and differs only in respect to the number of screws. The driving mechanism of the Henderson patent is simpler than that of the Byerlein patent because of the use of only two adjusting screws which are functionally sufficient for the narrow bed illustrated by Henderson. But granting the need of a deeper bed to accommodate a larger die, the necessary increase in number of adjusting screws and the appropriate changes

---

5 "My improved machine is of that type embodying a cutting block on which the sheet material is supported, a vertically-movable head situated above the cutting block and a plurality of dies carried by said head. The cutting block on which the sheet material rests * * * is mounted on a table which is adjustably carried in a suitable frame. The dies by which the articles are cut from the sheet material are * * * secured to a vertically-reciprocating head which is situated above the cutting block and which moves up and down in suitable guides formed in the frame. The head is given its vertical movement from a driving shaft journaled in the frame, and for this purpose said shaft has thereon two eccentrics, the eccentric straps of which are connected to the ends of the head by connections. The table is supported in the frame in such a way that it can be adjusted vertically to suit the requirements of use. For this purpose the table has depending from each end thereof two screws which have screw-threaded engagement with nuts, each of which is held from vertical movement by being situated between two bearings through which the corresponding screw loosely passes.

"Means are provided for turning all the nuts simultaneously, thus to raise or lower the cutting block. Each nut is formed on its periphery with spiral gear teeth arranged to engage the teeth of a spiral gear fast on a shaft journaled in the frame. There are two spiral gears on the shaft and each is of such a size as to mesh with the two nuts at one end of the table. The shaft has a bevel gear thereon which meshes with and is driven by a bevel gear on a shaft, the latter shaft having a handwheel thereon by which the shaft can be turned. By this means the nuts can all be rotated in one direction or the other thereby to raise or lower the table into the desired position."

6 (claim 9 "An apparatus of the character described adapted for working metal, a frame, a bed movably mounted on said frame, adjusting mechanism for said bed comprising four screw supports rotatably carried by said frame and adapted to support corners of said bed, a source of power, and actuating mechanism for said screw supports comprising a symmetrical drive to said screw supports for (from) said source of power for uniformly operating each of said screw supports to effect adjustment of said bed."

in the gear and shaft arrangement of the driving mechanism would not result in such variations of construction in the Henderson adjusting and driving mechanism as to constitute invention. The mechanical changes would come within Henderson's reservation of right "to such variations of construction as will be comprised within equivalent mechanism and that accomplish practically what I have set forth."

Furthermore, the variations and changes from the construction of the Henderson mechanism which are found in the Byerlein are anticipated in the earlier inventions which claim elevating and adjusting mechanisms for cutting blocks, tables, beds, lifting frames, or girder-tables which are elements of power presses or similar constructions. The art involved is the art of elevating and depressing mechanisms adaptable to vertical adjusting of "beds", "tables" etc. It is not the art of "adjustable beds" or tables, or "power presses." Consequently, the doctrine of anticipation is applicable in the instant case although the inventions relied upon claim for elevating and depressing mechanisms which relate to machines for leather-cutting (James and Fisher patents, supra), to a "mechanism for cutting out articles from sheet material by means of die" (Landin, supra) or even to "Drop-pit mechanism for unwheeling locomotives" which utilize a lifting frame comprising an elevating and depressing mechanism almost identical with that of Byerlein. (Coffey, supra.)

Plaintiff emphasizes the "huge size of these Byerlein power presses, the enormous weight of the bed and other parts, and the tremendous forces involved which require special consideration to solve the problems presented and to take care of the stresses and strains developed in the use of power presses of this character."

The evidence is that the power presses used in the automobile industry which utilizes plaintiff's bed-adjusting mechanism are subjected to tremendous strains upwards of 1,400,000 pounds. But there is in evidence the history of a Henderson press which was built to withstand the pressure of 1,000,000 pounds. On the other hand the Byerlein application states "that the invention is applicable to any type of press in which various size dies are used and in which such a bed adjustment is desirable." The application further states that while the invention is particularly applicable to large size presses in which the use of risers is particularly objectionable, yet it is apparent that "the invention can just as readily be applied to smaller presses."

It is true that most of the adjusting mechanism for which invention was claimed in the earlier patents, to which we have referred, were illustrated in connection with power press construction which involved relatively small strains and pressures; but it would seem to be a relatively simple engineering problem to adapt the essential features of construction of the adjusting mechanism of these earlier patents to machines requiring greater pressure which would be subjected to greater strains. This would not involve invention.

Claim 18[7] is anticipated in its material features by Fisher, James and Landin. The James patent describes a bed mounted for vertical adjustment, a sub-frame beneath the bed connecting the sides of the main frame and connecting the side members. It describes a screw adjusting means at each corner of the bed comprising male and female members, one member of each pair being secured to the bed and the other member rotatably mounted in the sub-frame. The inter-connected gearing of the James patent is not entirely beneath the sub-frame but is beneath the top of the sub-frame. But in the Byerlein patent were found the following specifications in connection with the inter-connecting shafting: "Suitable bearings are provided for these various shafts on the press base * * Of course, these shafts are suitably mounted for rotation in any convenient manner, —for example in brackets depending from the frame or in the frame itself."

In the James patent the gearing is in

---

[7] Claim 18. "In a power press, the combination of a main frame, a bed mounted for vertical adjustment therein, a sub-frame beneath said bed and rigidly connecting the sides of the main frame, screw adjusting means at each corner of the bed and comprising male and female members, one member of each pair being secured to the bed and the other member being rotatably mounted in the sub-frame, inter-connected gearing beneath the sub-frame and in driving relation to said rotatably mounted members, means for driving said gearing to adjust the bed up or down, and a slide guided for vertical reciprocatory movement above said adjustable bed."

driving relation to the rotatably mounted screw members for the purpose of adjusting the bed up and down, and the patent calls for a slide guide for vertical reciprocating movement above the adjustable bed.

Claim 19[8] adds to claim 18 "shafts and gearing beneath the sub-frame and operatively connecting said rotatably mounted members in pairs and in driving relation thereto." This is found in the James patent, and the Landin patent presents a variation of the same arrangement. The same relational construction of shafts and gears shown in the Byerlein patent is found in the Coffey patent.

Claim 7[9] relates to a fluid pressure system which is mounted upon and carried up and down with the adjustable bed. As pointed out by plaintiff this fluid pressure system is a "stripper" arrangement devised to strip the work from the lower die after the press has completed the operation of drawing the metal between the two dies.

The Hawkins patent (1,205,662, 1916) provides for a cushioning fluid pressure mechanism for use in connection with "draw presses wherein cooperating dies are machine operated to press metallic sheets into desired forms." The function of the Hawkins device is precisely the same as that of the fluid pressure, or "stripper"

arrangement of the Byerlein patent. The feature of the Byerlein device which is not literally anticipated by the Hawkins device is that the Hawkins patent is illustrated in connection with a stationary bed while that of the Byerlein is mounted upon and carried up and down with an adjustable bed.

The cushioning slide of the Byerlein patent operates only after the bed is adjusted in its proper position and its operation is the same as it would be in a press with a stationary bed. There is no cooperative relation between the adjusting mechanism of an adjustable bed and the cushioning slide. Each performs its own independent function. When no new function results from a combination of elements and the new result is merely that which arises from the operation of each one of the elements, the arrangement does not constitute invention.[10] There is merely an "aggregate of old results."[11]

We are of the opinion that claim 7 involves no invention over the Hawkins patent in view of the Henderson and other similar patents showing beds adjustable by a plurality of simultaneously operated screws.

Claim 21[12] adds to the features of claims 18 and 19 "the combination of a built up frame having vertical tie rods in

---

[8] Claim 19. "In a power press, the combination of a main frame, a bed mounted for vertical adjustment therein, a sub-frame beneath said bed and rigidly connecting the sides of the main frame, screw adjusting means at each corner of the bed and comprising male and female members, one member of each pair being secured to the bed and the other member being rotatably mounted in the sub-frame, shafts and gearing beneath the sub-frame and operatively connecting said rotatably mounted members in pairs and in driving relation thereto, driving means connected to said shafts to drive them simultaneously to adjust the bed up or down, and a slide guided for vertical reciprocatory movement above said adjustable bed."

[9] Claim 7. "A press comprising a frame, a plunger, a rotatable plunger operating shaft in said frame, a bed, a plurality of threaded members for adjustably supporting said bed in said frame for a large range of adjustment, a fluid pressure operated slide guided in said bed, and fluid pressure operating mechanism for said slide supported by said bed."

[10] "Applying the rule thus authoritatively settled by this court, we think no

invention is shown in assembling these old elements for the purposes declared. No new function is 'evolved from this combination'; the new result, so far as one is achieved, is only that which arises from the well-known operation of each one of the elements." Grinnell Washing Machine Company v. Johnson Company, 247 U.S. 426, 433, 38 S.Ct. 547, 550, 62 L.Ed. 1196.

[11] "Neither the combination of old elements or devices accomplishing no more than an aggregate of old results * * * nor the use of an old apparatus or appliance for a new purpose * * * is invention." Powers-Kennedy Contracting Corporation v. Concrete Mixing & Conveying Company, 282 U.S. 175, 186, 51 S.Ct. 95, 99, 75 L.Ed. 278. See also Lincoln Engineering Co. v. Stewart-Warner Corp., 7 Cir., 91 F.2d 757 for discussion of "aggregation."

[12] Claim 21. "In a power press, the combination of a built up frame having vertical tie rods in each end thereof, a bed mounted for vertical adjustment between the ends of the frame, a sub-frame beneath said bed and rigidly connecting the end members of the main frame,

each end thereof—the screw adjusting members and the tie rods at either end of the press being all in the same transverse plane."

The function achieved by placing the screw adjusting members and the tie rods in the same transverse plane and in the two side frames or members of the press is prevention, or minimization, of the inward bending strain of the side frames. As the pressure caused by the upper slide is exerted downwardly on the bed it is transmitted to the frame of the press through the bed-supporting screws, and if these screws are in the same transverse plane with the tie rods in the side frame members, the strain on the side members is directly downward in the plane of these side members. Consequently, the side frames are not subjected to an inwardly bending strain which would tend to force them inwardly from their vertical position.

In defendant's press three tie rods are used in the side frame members but the screw members instead of being located at each end of the press in the same transverse plane with the. tie rods are spaced inwardly some distance from the plane of the tie rods. It results that downward pressure exerted on the bed of the press by the upper slide will be carried through the supporting screws to the base of the press at points considerably inward from the frame members in which the tie. rods are placed. The pressure thus communicated to the base at points well within the planes of the side members will tend to depress the base member, thus causing a resulting tendency to an inward inclination of the side members from the vertical. In the defendant's patent there is no cooperating function or arrangement of the screw members and tie rods. And the evidence discloses that resistance to the bending strain on the side frame members of defendant's press is provided by designing a sufficiently heavy and rigid base to support the pressure strains without any depression of that portion of the base to which the strain is carried by the adjusting screws. We think the trial court correctly held that claim 21 is not infringed.

We conclude that the trial court did not err in holding that claims 7, 9, 18, and 19 were invalid, and in holding that claim 21 is not infringed.

The judgment of the District Court in dismissing the bill of complaint is

Affirmed.

screw adjusting means at each corner of the bed and comprising male and female members, one member of each pair being secured to the bed adjacent the respective tie rod and the other member being rotatably mounted in the sub-frame, interconnected gearing in driving relation to said rotatably mounted members, and means for driving said gearing to adjust the bed up or down, the screw adjusting members and the tie rods at either end of the press being all in the same transverse plane."