## GENERAL MACHINERY CORPORATION v. CLEARING MACH. CORPORATION.

### No. 6759.

Circuit Court of Appeals, Seventh Circuit.

May 20, 1939.

---

[16] Daniels v. Tearney, 102 U.S. 415, 26 L.Ed. 187; Great Falls Mfg. Co. v. Attorney General, supra.

Drury W. Cooper, of New York City, Greer M. Marechal, of Dayton, Ohio, and C. Blake Townsend, of New York City, for appellant.

J. H. Jochum, Jr., and Henry M. Huxley, both of Chicago, Ill., for appellee.

Before SPARKS, TREANOR, and KERNER, Circuit Judges.

TREANOR, Circuit Judge.

Plaintiff-appellant filed a bill in equity alleging infringement of original patent No. 1,768,503 issued to one Byerlein, for a drawing press, said patent now being owned by plaintiff. During the pendency of the suit the original patent was reissued, and thereupon, plaintiff filed a supplemental bill of complaint based upon the reissue patent No. 20,042. The bill prayed injunctive relief, accounting of profits, and damages. Issue was joined on the supplemental bill, and the reissue patent is the subject of the present litigation. The issues raised by the pleadings and evidence presented three questions to the District Court:

1. Did the reissue patent disclose invention over the prior art?

2. Did the accused machine of defendant infringe on plaintiff's machine?

3. Did plaintiff exercise good faith with the Patent Office in the proceedings for securing the reissue patent?

The District Court held with the defendant on the first question, and, on the basis of such holding, plaintiff's bill was dismissed for want of equity. The second and third questions were disposed of adversely to defendant. The conclusions of law were (1) that the patent claims herein involved were anticipated, or involved no invention over the prior art; (2) that defendant's accused machine embodies the features of construction set forth in the plaintiff's claims, and (3) that the proceedings in connection with the reissue did not violate 35 U.S.C.A. § 64.

The patent claims of plaintiff which are now involved are Nos. 13, 17, 20, 21, and 24–32 inclusive. It is agreed by both parties that claims 24 and 26[1] are illustrative of all the claims in suit and these are the claims chiefly relied upon. The letters patent recited that "This invention relates to presses and particularly to that type of press used in drawing metal." Plaintiff's machine has been used extensively in the manufacture of automobile bodies. It is of great size and when operating on a steel sheet having a thickness of approximately $\frac{1}{25}$ inch it is capable of pressing a quarter panel or side of an automobile body in one pressing operation which requires about 10 or 11 seconds. The letters patent, however, are not limited to machines of large size, nor do they relate to any particular branch of the metal pressing industry. The patent relates solely to a machine for pressing metal.

---

[1] Claim 24. "In a drawing press of the class described, a frame, a press bed in said frame, a die slide movable in said frame, toggle links connected to said slide for operating it with a dwell in its movements, a second die slide slidably mounted within said first named slide, toggle links connected to said second slide for operating it with a dwell in its movements independently of the first slide, and drive means for said toggle links."

Claim 26. "In a drawing press of the class described, a frame, a press bed in said frame, a die slide movable in one direction in said frame, toggle links connected to said slide for operating it with a dwell in its movements, a second die slide slidably mounted within said first named slide and operable in the same direction, toggle links connected to said second slide for operating it with a dwell in its movements independently of the first slide but with a conjoint period of dwell for said two slides, a die slide mounted in said frame for reciprocatory movement in a direction counter to that of said first two slides, and drive means for effecting sequence operation of said several toggle links and connected slides and said third die slide whereby said third die slide performs its drawing movement within said period of conjoint dwell."

The nature and functioning of plaintiff's machine, alleged to have been infringed, is summarized by plaintiff as follows: "The Byerlein patent in suit discloses a drawing press for completing in one cycle of operations a double drawing operation upon large metal stampings such as, for instance, the sides of automobile bodies * * * in which there are at least two downwardly moving slides, one of them a drawing member, each having toggle links connected to it so as to obtain a dwell at its lowest position. The second die slide being slideably mounted with (in) the first and the two having a conjoint dwell. Also in connection with these two an upwardly moving die slide which performs a reverse operation upon the stamping during the period of conjoint dwell of the downwardly moving slides, there of course being suitable power connections, suitable framework, a suitable bed in the machine and suitable connections from the source of power."

The downwardly moving slide, which is first actuated, moves downward to a clamping position and dwells, and clamps the metal blank which is to be drawn; the second slide moves downward, within the first, to a drawing or pressing position and likewise dwells; then a third slide moves upward to a drawing position and upon completion of this third movement all the slides are released and brought back to their original positions. The degree and speed of swing of the toggle link device determine the period of dwell of the first and second slides. The third upwardly moving slide operates during the period of conjoint dwell of the first and second slides and completes the drawing operation. It operates by means of a crank mechanism.

Dies are attached to the slides but these do not enter into the litigation as no patent claims relate to dies.

As stated above, the period of conjoint dwell is effectuated by toggle links. The toggle linkage which connects with the driving power, and controls the outer slide, is independent of that which connects with and controls the inner slide, but the timing relation is fixed. Each toggle link is pivotally connected at its center and operates spherically or in a rocking motion.

When the connecting arm of the toggle link extends straight it exerts its maximum pressure downward; as the toggle continues its motion it will "break" the straight line downward, and as the angle of "break" from the perpendicular increases by the spherical motion the pressure downward will be removed. While the pressure is being exerted downward by proximity to a straight line, the period of dwell exists. The period of dwell of the inner slide will be less than that of the outer slide and, as stated above, the degree and speed of swing determine the period of dwell.

In our opinion the disclosures of plaintiff's patent do not constitute invention over the prior art. No one previous patent or machine employed all of the mechanical features which are disclosed by the patent in suit; but unless the assembling of the features of the prior art of metal pressing, or drawing, machines, so as to make them usable in pressing or drawing metal blanks for automobile bodies constituted invention, plaintiff's patent is invalid.

Although highly involved, the essential features of plaintiff's patent are not new—the movement of one die slide in a direction counter to other die slides and the toggle link device to cause a conjoint dwell of two or more die slides to obtain two or more drawings in one continuous operation. They were well known in the prior art and were used for the same general purpose that plaintiff seeks to use them—the pressing of metal into a desired shape by one operation; and a dwell by toggle linkage was employed by the prior art to such end. Examples of triple-action presses, such as plaintiff's, are found in Butters and Morgan of the prior art. Butters, No. 353,439, disclosed a machine for pressing metal wherein one plunger operated a die downward and dwelt, a second plunger operated within the first and pressed a second die downward and dwelt, and during the conjoint dwell a third plunger operated a third die upward to make a reverse draw. No toggle linkage was employed; a separate reciprocating movement was imparted by means of "eccentrics." Defendant defines "eccentric" as a cam while plaintiff interprets it as a variant of a crank. This difference, however, is not relevant to the purpose of our present reference to Butters. Butters is referred to in order to show that a triple-action press with a reverse draw for pressing metal preceded plaintiff's patent. The particular mechanism for operating used by plaintiff was not preceded by Butters.

Morgan, No. 298,224, disclosed a machine for pressing metal which was also of the triple-action type with a reverse draw. In this patent a slide or plunger moves upward to press a metal blank into engagement with a fixed upper die. A second slide moves upward outside the first and presses the edge of the metal around the "periphery" of the first die, thus forming a flange. Both slides then .dwell and during such conjoint dwell a third slide moves downward to make a drawing operation in the middle of the metal. The dwell is controlled hydraulically. There are no toggle links. Plaintiff finds significance in the fact that the metal is heated for the pressing and that there are two lower slides and one upper as against two upper and one lower in the plaintiff's machine. Morgan's patent contemplated a machine which could press, or draw metal about an inch and a quarter in thickness; the machine pressed, or stamped out, thick boiler plates or large steel plates such as locomotive furnace fronts. Such metal is of course more resistant than metal $\frac{1}{25}$ of an inch thick, which plaintiff's machine has been used to press. The heating renders thicker metal more pliant and thus the process used by Morgan's machine met with and solved a problem which was not faced by plaintiff or its patent assignor. As to the fact that the reverse draw on Morgan's machine is downward whereas on plaintiff's it is upward, attention is directed to claim 26 which merely provides for two slides movable "in one direction" and one slide movable "in a direction *counter*" to that of the other two slides, which indicates that the principle involved is a counter draw rather than a specific directional draw. It seems clear that the particular direction of the draw is a matter of engineering choice to be selected on the basis of the shape desired, the nature of the resistance, convenience and other factors of mechanical preference rather than inventive genius. Butters disclosed an upward reverse draw and Morgan disclosed a downward reverse draw. There is no question that the prior art included both downward and upward sliding operations, and there would be no invention in merely selecting one such motion to constitute the reverse draw. Position, rearrangement and transposition of parts do not alone spell invention.[2]

Butters' patent was issued in 1886 and Morgan's in 1884. The triple-action press making a double draw has thus been known for at least some fifty years and, as defendant has pointed out, such knowledge has been published in trade journals. In the 1917 edition of Machinery's Encyclopedia, about ten years prior to the application for plaintiff's original patent, there appeared an informative article which indicated an extensive and widely recognized knowledge of a high degree of development and use of multiple-action, toggle-drawing, and double-drawing presses.[3] Such publication indicates that

---

[2] In re Becker, Cust. & Pat. App., 101 F.2d 557; Coffield v. Sunny Line Appliance, Inc., 6 Cir., 297 F. 609.

[3] The following excerpts are copied from Machinery's Encyclopedia, Vol. 5, pp. 149, 152, 153.

"Presses, Power. The ingenious designs and types of dies and power presses which have been developed have made it possible to produce many classes of work so rapidly that a great variety of parts are now made of sheet metal which formerly were cast, forged, or cut to shape in some type of planing or milling machine; in fact, the development of dies and power presses has revolutionized many manufacturing methods and made it possible to produce, on a commercial scale, high-grade but inexpensive mechanical devices, the cost of which would be excessive if any other method of manufacture were employed."

"Classification of Presses. * * * As examples of names which indicate the nature of the work for which the press was designed, there are drawing, embossing, trimming, punching, forging, wiring, and perforating presses, etc. The construction of presses for these different classes of work varies considerably, there being single-action, double-action, triple-action, multiple-crank, cam, knuckle-joint, and toggle presses. As is apparent, these names are based on constructional features and indicate particularly the nature of the mechanism which operates the slide or ram of the press."

"Double-Action Presses.—The double-action type of press is extensively used for drawing cylindrical or other circular shaped parts from flat sheet-metal stock. There are two slides which are operated independently; hence, the name *double action*. The outer slide is for operating the combined blanking die and blankholder of the double-action drawing die, whereas the inner slide operates the inner plunger or die which draws the part to shape. These slides may be actuated either by cranks, cams, or a toggle mech-

the triple or multiple action process was known to the prior art of drawing or pressing sheet metal, and was not original to plaintiff's patent. Prior to plaintiff's patent, the Bliss Company was representing to the trade the functions and advantages of toggle links, and triple-action or double-draw presses. Toledo Company was doing likewise with a double-action toggle link press with a reverse draw and urging its use for the manufacture of automobile bodies, fenders, hoods, radiators, etc.

The toggle link device for obtaining a dwell or pause in the pressure of a press, during which dwell there is a counter pressure, is also taught by the prior art. Klocke, No. 945,550, assigned to Bliss Company, created or disclosed a toggle link operated triple-action press which equals the ingenuity of plaintiff's patent. In Klocke's patent a lower slide moved up and dwelt by Toggle links, an upper slide moved downward, and dwelt by the same device, and then a third slide came down during the conjoint dwell. Thus the dwell was by opposing slides which obviously is not less involved than dwells by parallel slides.

Leavitt, No. 388,698, is a simpler form of press, but completely discloses the function and utility of the toggle link. This was a double-action press without reverse draw in which the outer downward slide dwells and the inner one draws. The specifications of this patent recite that cams may be used to impart motion and pause; but due to strain on the cam-surfaces rapid wear takes place which renders them inaccurate and therefore toggle links were employed to impart motion and pause. It is exactly this principle which plaintiff employed.

Langbein, No. 711,926, employed four slides with a double-draw and utilized toggle links.

There are other specific instances of the use in the prior art of toggle links as a part of the mechanism for pressing metals with a dwell in operation. The

---

anism. The presses having a crank form of drive are much used in the manufacture of seamless drawn articles of comparatively shallow depth. The crank type of construction permits of much faster and smoother operation than is practicable with cam-driven presses."

"Toggle-drawing Press.—Double-action toggle-drawing presses are preferable to drawing presses of the cam type, in all cases where the blanks have been previously cut (even though the stock may be heavy), or where the metal to be cut and drawn simultaneously is of comparatively light gage. The inner plunger of the toggle-drawing press is actuated by the main crankshaft * * * and the outer blank-holder slide receives its motion from two rockshafts connected by a system of links with the main shaft. This form of drive imparts a more uniform pressure to the blank than is possible with cam-operated drawing presses. The plunger to which the drawing die proper is attached is guided on the inside of the blank-holder slide and connected to the crank by an adjustable pitman."

"Double-drawing Press.—Double-drawing presses differ mechanically from the ordinary double-action press in having three instead of two moving slides, and, therefore, might appropriately be called triple-action presses. The principal reason for this design is to save time and increase production by making two drawing operations on a single article with one stroke of the press or to draw and redraw, or redraw twice, in a single opera-

tion. This type is particularly adapted for articles that require more than one drawing operation to reduce them to the required dimensions. The economy resulting from this method of drawing is not entirely due to the rapidity of mechanical production, but also to the fact that the shells require less handling and more space is occupied by the machinery and partially finished work. In addition, the annealing of shells between operations is unnecessary with the double-drawing press, because one drawing operation immediately succeeds the other and the heat generated in the first operation remains in the shell. * * * The double-drawing press, as built by the E. W. Bliss Co., is constructed with a movable bed which carries the first- and second-operation drawing dies one above the other, and which rises, thus moving the dies upward to meet the stationary blank-holder. Then the first-operation drawing punch actuated by a toggle mechanism descends, drawing the first-operation shell, after which it remains stationary and acts as a blank-holder for the second drawing operation, when the punch attached to the crank-actuated crosshead descends and completes the second drawing operation. As the movable bed descends, the drawn shell is ejected from the die. All the moving parts of this press are counterbalanced during their upward and downward movements by a hydraulic plunger and accumulator system."

publications above referred to in relation to triple-action presses copiously revealed a knowledge of toggle links and their use.

The lower court stated that it was less than genius "To take Morgan and Butters, and by means of eccentrics and toggles and cams, and applying power to them, make them work." Plaintiff, of course, insists it was the first to join the two for use in the automobile industry. But the following statement by the Supreme Court is pertinent: "* * * we find that the patent is invalid. It consists of a combination of elements all of which were old in the art. * * * Neither the combination of old elements or devices accomplishing no more than an aggregate of old results * * *, nor the use of an old apparatus or appliance for a new purpose * * * is invention." [4]. And in Grinnell Washing Machine Co. v. Johnson Company,[5] the court stated: "* * * we think no invention is shown in assembling these old elements for the purposes declared. No new function is 'evolved from this combination'; the new result, so far as one is achieved, is only that which arises from the well-known operation of each one of the elements." In Crossley v. Falknor[6] this Court had before it the question of the validity of a patent whose subject was a temperature control system by means of a cabinet construction which included multiple cabinet containers with walls of heat insulating material, a heating unit, thermostat and thermometer. The purpose of the patent was to maintain uniformity of temperature. The patentee contended that his system had been used in the radio broadcasting industry extensively for the purpose of controlling the temperature in a piezo electric crystal which determines by its sensitivity the frequency of a radio broadcasting station. Slight changes in temperature affect such crystal so as to alter the frequency. This Court held the patent invalid and made these observations which are applicable and pertinent to the instant case: "While there is much discussion in plaintiff's brief of broadcasting stations * * *, the patent in suit nowhere mentions the subject of broadcasting. * * * It is here referred to because the complexities of radio construction with a piezo electric crystal in a vacuum tube are likely to produce an erroneous impression as to the baffling intricacies and technical nature of plaintiff's invention. * * * The development of temperature control in the incubator, the electric cooker and other utensils in the cooking art, and other somewhat similar arts, has led to the issuance of patents which have largely preempted the field which plaintiff sought to enter. * * * The teaching of the similar and kindred art [was] too well developed and known, to permit us to give plaintiff a position already attained and a recognition already achieved by others." In the foregoing case the prior art cited had not reached a greater degree of efficiency and similarity of use in relation to the patent in suit than the prior art in the instant suit; and the prior art which was assembled in that case was definitely not more advanced in knowledge and suggestion than in the instant case.

With regard to size, the Supreme Court has stated that "obviously a mere change in proportion would involve no more than mechanical skill and would not amount to invention." [7] This Court in General Machinery Corp. v. Clearing Mach. Corporation,[8] held that to adapt the essential features of construction of adjusting mechanism in earlier patents to machines requiring greater pressure, and which would be subjected to greater strains, does not involve invention.

A review of the patent now in suit reveals only an assemblage of old mechanical devices for, at most, a similar use—not a new or different use—accomplishing an aggregate of former results in the art, without disclosing any new functions; and we are of the opinion that the combination accomplished by Byerlein "fails to show that exercise of invention, producing a novel and useful result from the co-operating action of the elements, which is essential to distinguish patentable combination from an aggregation of old elements so placed by mechanical skill as to do work more rapidly and economically." [9]

[4] Powers-Kennedy Contracting Corp. v. Concrete Mixing Co., 282 U.S. 175, 51 S. Ct. 95, 99, 75 L.Ed. 278.

[5] 247 U.S. 426, 38 S.Ct. 547, 550, 62 L.Ed. 1196.

[6] 7 Cir., 103 F.2d 674, April 14, 1939.

[7] Powers-Kennedy Contracting Corp. v. Concrete Mixing Co., supra.

[8] 7 Cir., 99 F.2d 20.

[9] Grinnell Washing Machine Co. v. Johnson Company, supra.

Since we conclude that the patent in suit is invalid for want of invention, it is unnecessary to consider the questions of infringement and validity of the reissue.

The decree of the District Court is affirmed.