GENERAL ELECTRIC CO. v. SANGAMO ELECTRIC CO.

(Circuit Court of Appeals, Seventh Circuit.   October 5, 1909.)

No. 1,533.

1. PATENTS (§ 109*)—PROCEEDINGS ON APPLICATION—AMENDMENT OF CLAIMS.
   An applicant for a patent, after a successful contest in interference proceedings, cannot, without changing his specification, broaden his claims to include something not shown nor claimed in his original application, but which is claimed in the interfering application.

   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 152; Dec. Dig. § 109.*

   Amendment of application, see note to Cleveland Foundry Co. v. Detroit Vapor Stove Co., 68 C. C. A. 239.]

2. PATENTS (§ 328*)—ANTICIPATION—ELECTRIC METER.
   The Cox patent, No. 791,673, for an electric meter, claims 11, 12, 15, 16, 17, 18, 19, and 20, are void for anticipation.

   [Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

3. PATENTS (§ 16*)—IMPROVEMENTS—"INVENTION."
   "Invention," in the nature of improvements, is the double mental act of discerning, in existing machines, processes, or articles, some deficiency, and pointing out the means of overcoming it.

   [Ed. Note.—For other cases, see Patents, Cent. Dig. § 15; Dec. Dig. § 16.*

   For other definitions, see Words and Phrases, vol. 4, pp. 3749–3754.]

Appeal from the Circuit Court of the United States for the Southern District of Illinois.

Suit in equity by the General Electric Company against the Sangamo Electric Company.   Decree for defendant, and complainant appeals. Affirmed.

The appeal is from a decree dismissing the bill in a suit for the infringement of letters patent No. 791,673, issued June 6, 1905, to Frank P. Cox, assignor to appellant, for new and useful improvements in Electric Meters.   The claims sued upon are as follows:

"11. In a meter, two current armature-paths, means for creating a magnetic field in operative relation with one of said paths and for creating a magnetic field of different strength in operative relation with the other of said paths. and means for varying the ratio of the currents flowing through said paths.

"12. In a meter, the combination of two armature-paths carrying torque-producing load-currents, and means for varying the ratio of the torques produced by the currents flowing through said paths."

"15. In a meter of the type described, the combination of two main-current armature-paths in multiple and in which the currents conspire to produce rotation, and means for adjusting the proportion of current flowing through said paths.

"16. In a meter of the type described, the combination of two main-current armature-paths in which the currents conspire to produce rotation, and means for adjusting the proportion of current flowing through said paths.

"17. In a mercury motor meter, the combination with a main armature-current path, of a second armature-current path producing a lesser torque, and means for changing the distribution of current in said paths to adjust the action of the meter.

"18. In an electric meter, a receptacle, a disk of conducting material rotatably mounted therein, a body of conducting fluid contained by the receptacle in contact with the disk, means for establishing electrical connections between the fluid and an outside conductor at two different points adjacent the pe-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

riphery of the disk, a second conductor also electrically connected to the conducting fluid, means for causing current to flow from one conductor to the other conductor through the conducting fluid and disk in two paths, one of said paths being between one of said points and said second conductor and the other of said paths being between the other of said points and the second conductor and means for causing magnetic lines of force to intersect said paths, the density of the lines intersecting one path being greater than the density of the lines intersecting the other of said paths.

"19. In an electric meter, a receptacle, a disk of conducting material rotatably mounted therein, a body of conducting fluid contained by the receptacle in contact with the disk, means for establishing electrical connections between the fluid and an outside conductor at two different points adjacent the periphery of the disk, a second conductor also electrically connected to the conducting fluid, means for causing current to flow from one conductor to the other through the conducting fluid and disk in two paths, one leading from each of said points, and means for creating magnetic lines of force in co-operative relation with said current-paths, the density of the lines in co-operative relation with one of said paths being greater than the density of the lines in co-operative relation with the other of said paths.

"20. In an electric meter, the combination with two armature-paths carrying the load-current and having different torque-producing effects, of a loop or branch conductor connecting said paths."

The original application did not contain these claims.

The invention is set forth in the following descriptive portion of the patent —the patent issuing, as to its descriptive portion, in exactly the language of the application:

"My invention relates to an electric meter in which a current-carrying movable member floats in some conducting fluid, such as liquid mercury. Heretofore in the construction of meters of this character the shaft connecting the movable element of the indicating mechanism has been extended above the surface of the fluid in which the movable element of the meter has been submerged. I have found that the construction and operation of meters of this character can be improved by entirely submerging both the movable element of the meter and its shaft. Among other advantages obtained by this construction the skin friction between the submerging fluid and the shaft where the shaft leaves the surface of the mercury, which would otherwise exist, is done away with. The meter may also be prepared more readily for shipment.

"With my improved meter the motion of the movable element of the meter is transmitted to the indicating mechanism by means of the magnetic attraction existing between a mass of magnetic material carried by the shaft and another mass of magnetic material outside of the submerging fluid connected to the indicating mechanism.

"My meter also possesses novel means for making its accuracy independent of temperature variations and for preventing the injurious amalgamation of the connecting leads.

"Other characteristic features possessed by my improved meter will be pointed out in the specification, in which I have hereinafter described in detail one embodiment of my invention.

"The accompanying drawing is a sectional elevation showing my improved meter.

"Referring to the drawing, a supporting-frame 1 of ordinary construction supports the operative mechanism of the meter. Upon the support 1 is mounted the casing 2, holding the conducting fluid 3. This fluid is preferably mercury. Bearings 4 and 5 are formed on the inside of a casing at the top and bottom, respectively. The movable element or member of the meter comprises a shaft 6, pivoted between these bearings and having mounted upon it a current-carrying member 7, which is a disk of conducting non-magnetic metal. Preferably the material out of which the disk is made is copper; but other metals may be used. In order to prevent an excessive upward pressure against the bearing 4 due to difference in the specific gravities of the mercury and the movable element, a weight 16, of some suitable material, such as tungsten, heavier than the surmerging fluid, is carried by the shaft. This weight is also submerged.

"In the construction which I have shown in the drawing the casing 2 is formed in two sections 8 and 9, and the sections comprise central tubular portions 10 and 11, respectively, and circular substantially plane portions 12 and 13 at right angles thereto. In addition the lower section 9 is formed with a tubular portion 14 at the periphery of the plane portion 13. The plane portions 12 and 13 are separated by the tubular portion 14 to form a cylindrical space in which the disk 7 is placed. These portions are so proportioned that the distance separating the disk from the portions 12, 13, 14 is comparatively small. The sections are secured together by screws 15 to form a tight joint. The casing may be formed of suitable non-magnetic material, such as copper, brass, or aluminum.

"A shaft 17, extending in alinement with the shaft 6, is pivoted externally of the casing 2 at the upper end of the tubular portion 10 and is geared to the indicating mechanism of the meter. The shaft 17 carries a U-shaped piece of magnetic metal 18. The legs 19 of the U-shaped portion straddle the tubular portion 10 of the casing 2. The shaft 6 carries a piece of magnetic material 20, which extends transversely to the shaft to near the inner surface of the inclosing casing. One or both of the members 18 and 20 are permanently magnetized. Hence any rotation of the shaft 6 will cause a corresponding rotation of the shaft 17.

"The meter is shown in the drawing as employed to measure the current flowing in the line 21. One side of this line is connected to the binding-post 22, carried by the tubular portion 11 of the casing. The other side of the line is connected to binding-posts 23 and 24 through branch conductors 25 and 26, respectively. The binding-posts 23 and 24 are carried by the tubular portion 24 of the casing and are shown as diametrically opposed to one another. Within the meter the load current flow is in two paths, one between the binding-posts 22 and 23 and the other between the binding-posts 22 and 24, and the current in each path is carried partly by the casing, partly by the mercury, and partly by the disk 7.

"Magnets 27 and 28 are placed with their poles upon opposite sides of the portion of the casing which incloses the disk 7 in such position that the fields of force produced by them traverse the space through which the current flowing between the posts 22 and 23 and 22 and 24, respectively, passes. The reaction between the flux or lines of magnetic force and the currents in the two paths produce torques tending to turn the disk, as is well understood, and the magnets 27 and 28 have their poles so placed that they both act upon the current carried by the disk to produce a rotation of the disk in the same direction.

"The principal retarding force acting upon the disk 7, tending to restrain its rotation, is that due to the eddy-currents caused in the disk by its movement through the fields of the magnets 27 and 28. The effect of increasing the temperature of the disk from any cause is to increase its electrical resistance. This cuts down the eddy-currents, and so reduces the retarding forces, tending to restrain the rotation of the disk. As a result of this there is a tendency for a meter of this character to run too fast when the disk is heated in any manner. The heating of the meter may arise from the current carried or from the location in which it is placed. To avoid this error, I have made the magnet 28 stronger than the magnet 27, and I have placed resistances 29 and 30 in the lines 25 and 26, respectively. The resistance 30 is made out of some material, such as iron wire, which has a high temperature coefficient. The resistance 29 may be made out of some material, such as German silver, having a very low coefficient of resistance, or it may be made out of some material, such as graphite, which has a negative temperature coefficient. As a result of this construction a change of temperature disturbs the distribution of the current between the lines 25 and 26. When the temperature of the system is raised, more of the current passes through the resistance 29 and less through the resistance 30. The current passing through the resistance 29 passes through the field produced by the weaker magnet 27. The result of this change in division or the current therefore is to reduce the torque tending to rotate the disk 7. A decrease in temperature will of course produce an opposite change in the current distribution and torque. If the resistances 29 and 30 and the strengths of the magnets 27 and 28 are correctly proportioned, a meter may be obtained in which the changed retarding effect,

due to a change in the temperature of the disk 7 and resistance 29 and 30, will be exactly met by a corresponding change in turning torque.

"The binding-posts 22, 23, and 24 are preferably made of iron or other non-amalgamating metal, as when made of the ordinary material, such as copper or brass, or when the wires 21, 25 and 26 are directly connected to the mercury, there is a tendency for the mercury to amalgamate with the wires. rendering them brittle and destroying their tensile strength. This difficulty is avoided by making the binding-posts of iron. Instead of making the binding-posts of iron I may place a section of iron or other non-amalgamating metal at some other point in the meter-circuit."

The drawing to which the descriptive portion refers, follows:

The appellee manufactured and sold electric meters embodying the features shown, described and claimed in letters patent No. 816,922, granted to Robert O. Lanphier, April 3, 1906, a diagram of which follows:

In the brief for appellant, the construction and combination embodied in the two patents are described as follows:

"Comparing now this construction and combination of elements with the construction and combination described in the patent in suit for adjusting the speed of an electric meter, it will be seen that they are substantially the same in all essential particulars, differing only in minor details, and that they are both designed to and in fact accomplish the same result in the same manner. In each case the current is divided so as to flow across the armature in two paths.

"In each case one of these paths leads across a weaker magnetic field than the other.

"In each case there are provided means for varying the ratio of the current flow through said paths so that the total turning effect or torque may be made to produce a speed which will correspond with the rate at which the current flows through the meter.

"In each case the means for varying the ratio of the currents depends upon the ratio of the resistance of the two paths which are provided for the currents, the only difference being that in the patent in suit automatic means are described for varying the ratio of these resistances while in defendant's meter the ratio is varied by manual adjustment."

The further facts are stated in the opinion.

Thomas B. Kerr and Parker W. Page, for appellant.
Charles E. Pickard, for appellee.

Before GROSSCUP and BAKER, Circuit Judges, and ANDERSON, District Judge.

GROSSCUP, Circuit Judge, after stating the facts as above, delivered the opinion.

Cox, in his original application, described as one element of his invention, the automatic means for varying the ratio of the resistances, and limited his claims to a combination of which such automatic means was an element. The application of Lanphier was for a combination that embodied the varying of the ratio of resistance by manual adjustment. The two applications having come into interference and priority having been awarded to Cox upon the features set forth in his application, additional claims were filed and allowed, which, if valid, extended the patent so as to include the variation of resistances by manual adjustment as well as by automatic means. These are the claims here sued upon.

Invention, in the nature of improvements, is the double mental act of discerning, in existing machines or processes or articles, some deficiency, and pointing out the means of overcoming it. A reading of Cox's original application discloses either that Cox did not discern that there was a deficiency in existing meters other than that produced by the variation of the plate by temperature; or, discerning that the plate was varied by causes other than temperature, he did not know the means of overcoming them; or (and this probably is the fact), discerning that the disk was varied by causes other than temperature, and knowing the means of overcoming them, he did not regard either the discernment of the deficiency or the perception of the means as something that was new; for, had he regarded such discernment of the deficiency, and such perception of means, as something new, he would have embodied them in his application and original claims. True, the fact that Cox may have mistakenly regarded these things as not new, and therefore not the subject of a patent, would not have prevented him from correcting his mistake if done in apt time, by amending his application and broadening his claims. But this must be done by a showing in his application that the conception was his, and that it was new and novel; and this he did not do. His application, either before or after the new claims were inserted, discloses no conception of the deficiency to which the Lanphier patent was directed, antedating Lanphier: and, of course, such conception after the reading of Lanphier's application would be anticipated by the Lanphier disclosures; so that there is nothing in the record before us showing that Cox anticipated Lanphier in either one of the two acts constituting invention, so far as either of those acts relate to the variation of the disk produced by causes other than temperature. The claims of the Cox patent to this extent, therefore, are invalid.

The decree of the Circuit Court is affirmed.