## WOLFF v. WESTERN ELECTRIC CO., Inc.
### Civil Action No. 1723.

District Court, D. New Jersey.

May 25, 1943.

Albert B. Kahn, of Trenton, N. J. (Francis G. Boswell, of Washington, D. C., of counsel), for plaintiff.

Katzenbach, Gildea & Rudner (by George Gildea), of Trenton, N. J. (Henry R. Ashton and E. J. Driscoll, both of New York City, of counsel), for defendant.

FORMAN, District Judge.

Plaintiff filed an application for a patent on June 26, 1926, which was allowed on July 7, 1931, under number 1,813,334. The purpose of the invention as recited in the patent "is to provide a single control for both the filament and plate batteries of an audion circuit, whereby the filaments may be lighted prior to the circuit on the plate being closed, so that reactivation of the audion may take place without removal from its normal position in the circuit".

Two claims were allowed for the patent, as follows:

"1. In an audion circuit in which a switch is interposed in the common leg of the plate and filament circuits, the method of maintaining the activated condition of the filaments which comprises operating the switch to first close the filament circuit, and after an appreciable time further operating the switch to close the plate circuit without opening the filament circuit.

"2 In combination with an audion circuit including plate and filament circuits and separate energizing means for said plate and filament circuits, a three pole control switch having a movable element to electrically connect or disconnect said poles, one of said poles being connected in the common leg of the plate and filament circuits and the other poles respectively connected one to each of the remaining terminals of said energizing means, said movable element being actuable to first close the filament circuit and thereafter to close the plate circuit without opening the filament circuit, said movable element being retainable in either of its two circuit closing positions."

Plaintiff charges that his said patent has been infringed by the defendant because it incorporated his invention in its Western Electric 23–A radio transmitter and in its Western Electric 355–E–1 radio transmitter.

More specifically, plaintiff charges that in the construction employed in these transmitters there is a method of maintaining activation condition of the tubes through the medium of a switch interposed in the common source or leg and its actuation first to close the filament circuit and after an appreciable time its further actuation to

close the plate circuit without opening the filament circuit. He contends that in his invention the same operation takes place in the battery energized circuit of his patent.

The defendant contends that plaintiff's claims are not infringed in its devices; that in view of the file history plaintiff's claims cannot be construed broadly enough to be infringed and in any event the plaintiff's claims are invalid in view of the admitted prior knowledge.

In 1923 plaintiff was granted licenses for limited commercial and experimental broadcasting. He claims that in operating his station in Trenton, New Jersey, he experienced trouble when transmitting tubes used by him were burned out through the inadvertent closing of the plate circuits prior to the application of energizing current to the filaments. This was in the days when receiving sets were battery energized and transmitting sets were similarly energized or with direct current generators. As a consequence of his experience, plaintiff conceived the idea of employing a knife switch supported on a base by means of a hinge clip followed by an intermediate clip and an outer clip. The clips were forked or bifurcated so that the switch might engage them in sequence, the first application of the switch thrusting it into the hinge clip, the second into the intermediate clip and the third into the outer clip. The hinge clip was connected to the minus A binding post. The intermediate clip was of greater length than the outer clip and was connected to the minus terminal of the filament battery. By engaging the switch in this clip the circuit on the filament battery would be closed ahead of closing the circuit on the plate battery of which the minus terminal was connected with the outer clip. If the switch was moved into engagement with the intermediate clip and permitted to remain in position, the audion filaments would be energized with no potential from the plates. The patent taught that the switch should be permitted to remain in this position for a short period, "say three or four minutes", so that the "coating of the filaments will be caused to flow back to them from the plate or elsewhere that it may have been deposited in the tubes.[1] The filaments having thus been permitted to burn a short while to restore their coating, a further movement of the switch into engagement with the (outer) clip 22 will result in closing the plate battery circuit".

At the trial plaintiff contended that it was his purpose to preserve the original condition of the tubes so that reactivation in its strictly technical sense would not be necessary. He stated that it was not his purpose to reactivate tubes in the sense that reactivation is now or possibly then was understood and conceded that the term "reactivation" may have been inadvisedly used by him. He further conceded that reactivation of filaments in the strictly technical sense of the term was known prior to the date of his invention and he admits that it was known to be advisable to energize the filament prior to closing the circuit that would apply direct current to the plate. He states that his invention did not lie in the provision of means for using either of these two expedients although it had the advantages of both. The plaintiff claims he *first saw the possibility of preserving the original condition of the tube by the systematic application of filament and plate voltages, and a means for carrying out the method.* He says that it is clear from his patent that this was its purpose despite the use of the "possibly ill-advised word 'reactivation'".

Plaintiff commercialized his invention in the form of a switch accompanied by a circular prescribing the method for its use and according to his testimony he sold about fifteen hundred of them. The directions contained in the circular read as follows:

"Aways place the blade of switch in position 'A' for a minute before using the set; then to position 'B' and tune in your station. Your tubes will not be shocked and your filaments will not throw away needlessly the thoriated element. The lighting of the filament before applying the plate voltage is the best known radio practice. Also, it permits full expansion of the filament before it is put to work discharging its electrons. This procedure insures longest possible life of your tubes without overloading them to obtain good clear long-distance signals.

"If you do not use the 'Minus' switch as directed, you can only blame yourself for inferior results.

"We might add, that in extreme cases, where the tubes have become quite inactive, it is a good plan to leave the switch in

---

[1] A mistaken theory upon the part of the plaintiff, as he now concedes.

position 'A' for twenty to thirty minutes before changing to position 'B'. This will oftentimes bring the tubes back to their normal condition.

"Tell your friends what happened before and after using the 'Minus' switch, and we feel sure they will want one, too."

Plaintiff's application for his patent was before the examiner about four years. He founded his original application on six claims. [2] After the second rejection by the examiner, he cancelled claim five. There were two more rejections, the final one being on November 5, 1930. In the latter the examiner gave the applicant the following encouragement: "It may be possible that a patentable method claim can be prepared which will adequately cover any patentable subject matter contained in this application. While this action is made final, such claim will be considered if incorporated in a promptly filed response." Thereupon, plaintiff cancelled all of the claims and the two claims as indicated at the head hereof were inserted. These apparently met the examiner's objections for the patent was thereupon allowed.

The plaintiff's first claim is for the method of maintaining the activated condition of filaments by operating a switch interposed in the common leg of the plate and filament circuits to first close the filament circuit and after appreciable time further operating the switch to close the plate circuit without opening the filament circuit. In his second claim he describes separate energizing means for the plate and filament circuits by way of a three "pole" control switch having a movable element to electrically connect or disconnect the said poles, one of said poles being connected in the common leg of said plate and filament circuits and the other poles respectively connected one to each of the remaining terminals of said energizing means. The movable element is actuable to first close the filament circuit and thereafter to close the plate circuit without opening the filament circuit and is retainable in either of its two circuit closing positions.

At the time of the alleged invention the energizing means utilized by Wolff was by way of batteries. The patent specified that the switch was to be maintained closed in its intermediate position for a period of three or four minutes so that the audion filaments would be energized "with no potential present on the plates", then the switch was to be manually operated so as to close the plate circuit. Plaintiff recommended the knife form of switch but stated in his patent that the invention could be carried out by any form of switch that would provide for closing the filament battery circuit ahead of the plate battery circuit.

At the time of plaintiff's alleged invention two switches were or could be used in order to accomplish the filament and plate circuit energizing. It was old in the art then to know that the filament circuit should be first energized before the plate circuit was closed. The Kishpaugh patent, No. 1,601,075, referred to by the examiner, contains the following references:

"It has been heretofore proposed to provide means, whereby such devices may be safeguarded against high space voltages and excessive space current, by applying heating current to the cathodes of the devices included in the apparatus and delaying the application of the operating voltage to space path electrodes of the devices until after their cathodes have been heated

---

[2] "1. In combination with an audion circuit including filament and plate energizing circuits, a single means controlling both the latter circuits and operable to close the filament circuit ahead of the plate circuit but retainable in the filament circuit closing position.

"2. In combination with an audion circuit including filament and plate energizing circuits, a single means for closing the filament circuit independently of the plate circuit but retainable in the filament circuit closing position.

"3. In combination with an audion circuit including filament and plate energizing circuits, a control switch common to both of said energizing circuits and actuable to progressively close the two but retainable in the filament circuit closing position.

"4. In combination with an audion circuit including filament and plate energizing circuits, a control switch common to both of said energizing circuits and having a movable element actuable to progressively close them, said movable element being retainable in either of its two circuit closing positions.

"5. In a radio receiving set, a tube having filament and plate circuits, and means for closing said filament circuit ahead of said plate circuit.

"6. A radio tube having filament and plate circuits and a circuit closing means adapted to close said plate circuit after the closing of said filament circuit, and not otherwise."

to substantially operating temperature.

* * * * *

"The present invention provides an arrangement, whereby the energy is applied to the electrodes of the discharge devices in proper sequence and its application is controlled to prevent the production of surges in the circuits of the system.

"In accordance with this invention current is supplied by a low voltage generator to heat the cathodes of the devices and space current is supplied by a relatively high voltage generator. These generators are simultaneously driven by a motor. A time limit relay energized from the cathode heating circuit serves to delay, until the cathodes have had time to become fully heated, the application of energizing current to the field winding and completion of the armature circuit of the high voltage generator."

An earlier Kishpaugh patent No. 1,473,-433 also discloses sequential closing of the filament and plate circuits. In fact, plaintiff concedes that it was known to be advisable to energize the filament prior to closing the circuit that would apply direct current to the plate and also that reactivation of filaments in the strictly technical sense of the term was known. He insists that his invention lies in the possibility of preserving the original condition of the tube by the systematic application of filament and plate voltages.

Knife switches, such as the one shown in the plaintiff's patent, connected in a plurality of electrical circuits and operated to first close one and after a lapse of time further operated to close another circuit without opening the first circuit, and retainable in either of the two circuit closing positions were also known prior to the earliest date claimed by the plaintiff. One of these is shown in the Horton patent, No. 1,227,789, and the other in the Mahoney patent, No. 1,248,519.

Although in his patent and in the circular with which he accompanied the commercial distribution of his product, plaintiff distinctly refers to its use for "reactivation" or a process whereby tubes that have become quite inactive would by the use thereof be brought "back to their normal condition", plaintiff now disclaims that his patent was contrived to effect the purpose of reviving or reactivating tubes. He now suggests that though this might be an incidental use of his patent, its newness lay in the theory that the use thereof preserved the original condition of the tubes so that reactivation would not become necessary. He accomplishes this through what he calls the systematic application of filament and plate voltages by way of the operation of the knife switch in the manner described by him.

As anticipatory of plaintiff's alleged invention, defendant offered a number of patents and publications. The Kishpaugh patents Nos. 1,473,433 and 1,601,075 have already been mentioned. A British patent to Edgeworth, No. 214,089 under date of April 17, 1924, was cited, as were the following publications, to wit: an article entitled "The Avalon-Los Angeles Radio Toll Circuit" contained in the "Proceedings of The Institute of Radio Engineers", Volume 9, No. 6, page 484, under date of December, 1921; article in the "QST" of November, 1923, entitled "Lana, Chatham, Mass.", page 57; an article in the "Radio News" of February, 1924, by Charles Speaker, on page 1078, and a brief article under the heading of "On and Off Switch" and drawing in "The Wireless World and Radio Review" of November 5, 1924, at page 160. In addition, the defendant cited its own "Western Electric 1-A Public Address Transmitter" shown to be in use in 1922.

The plaintiff criticized the Kishpaugh patents as being different from his device because they were generator energized and the inadvertent opening of a switch would prevent beneficial results. While conceding that the Kishpaugh patents show knowledge that the filaments of tubes should be heated first, plaintiff contended that the preservation of the tubes in their original condition was not appreciated by Kishpaugh even if such a result was accomplished by what he taught. Since the substance of the publication "The Avalon-Los Angeles Radio Toll Circuit" was founded on the Kishpaugh teachings, it was subjected to the same criticism by plaintiff. Plaintiff attacked the Edgeworth British patent because the plate potential was permitted to be applied so quickly after filament heating as to render its method of no moment. He said that the "Lana, Chatham, Mass." publication was inapplicable because there was no sequential application of filament and plate potential in this teaching except in so far as a particular rectifier employed delayed the application of plate potential by a slow heating filament. As to the article by Charles Speaker in the "Radio

News", plaintiff said that the filament excited generator described therein might fail and permit energization of the plate circuits. He found the "On and Off Switch" mentioned and drawing in "The Wireless World and Radio Review" too vague to be considered anticipatory and the contracts as shown therein to be different from his invention because they were all of the same height. He claimed that nothing in this publication suggested that the switch described therein was to be used for the purpose which he disclosed.

In connection with defendant's "1–A Public Address Transmitter" there was a stipulation between the parties hereto in which they agreed that the defendant had developed and designed a public address system under the name "Western Electric 1–A Public Address System". There was a further agreement concerning a description, drawings and photographs of such installations of the defendant. It was agreed that one of the photographs showed control panels of such a system disclosing in the panel of the 6,000–A rectifier the single switch labeled "Fil. Plate", which was substituted during the year 1922 for two switches.

Plaintiff contended that since the operation of this switch (a three-position snap switch) required an interval of five minutes from the time that it was turned to heat filaments until it was turned to connect the plate circuits, the delay was too long if it was merely intended to preserve the original condition of the tubes although he candidly admitted that his two to three minute interval in the operation of his knife switch, or any other interval, was arbitrary so long as the operator made certain to energize the filament before applying plate potential. Plaintiff insisted that there was no recognition of the delayed application of plate potential for the "dominant purpose of preserving the original tube condition" in the Public Address Transmitter.

In general, plaintiff charges that certain elements incorporated in each of the examples of prior art go to show that none of the designers thereof appreciated the fact that application of plate potential at or after the filaments attained full temperature would operate to keep the tubes in the condition in which they were at the time of first use.

I cannot agree with this criticism. Without particularly describing each detail in each example it is sufficient to say that each recognized that hazard ensued if the filaments were not heated prior to the application of plate potential and the prevention of hazard and the preservation of status quo are certainly equivalents in this case.

I am not persuaded that plaintiff accomplished a patentable invention when he introduced the use of the switch as described by him in his invention. He had been active in the field of radio transmission at this time. He was licensed to operate a transmitting station. He can be said to be skilled in the art. The substitution of the manually operated switch as indicated by him in his patent for another switch or switches in order to assure the application of the filament circuit prior to energizing the plate circuit was not in the nature of discovery but simply a device that a skilful person familiar with the art of that day would adapt to the purpose.

In the patent itself no structural means is advanced for the purpose of automatically delaying the application of the closing of the plate circuit for any appreciable length of time after the filament circuit has been closed. This is entirely a manual operation and its success depends upon the user. Nothing would prevent the user of the apparatus from completely closing the knife switch in one movement. While it is true that the filament circuit because of the construction of the switch would be closed first in such a movement, the closing of the plate circuit would follow in almost unappreciable time sequence. I realize that the plaintiff has shown in the evidence that automatic means for time delay *could be* constructed in association with the structure suggested in his patent but the fact remains that in the patent itself there is no suggestion of a structural means to effect the time delay between the closing of the filament and plate circuits.

Plaintiff insists that he has invented a method for the preservation of the original condition of tubes as well as a means for carrying out the method. The method was to heat the filament in the tube prior to the application of energy through the plate circuit. The means to carry it out was the installation and operation of his switch. Kishpaugh and others taught, and plaintiff concedes that it was well-known before his invention, that it was advisable to energize the filament prior to closing the circuit that would apply direct current to the plate. The plaintiff assured himself that he

could do this by adapting the already known form of switch. No new result was accomplished. No new or novel means was introduced to bring about the old result.

The attainment of the objective for which the plaintiff contends, namely, the "preservation of the original condition of the tubes", was effected negatively, so to speak, because the tubes would *not* be shocked by the energizing of the plate circuit before the filament had been heated. In so far as the tubes thus were not destroyed their original state was preserved. This was just as true if two switches were used and instructions for their use in sequence observed as if the plaintiff's switch were used according to his instructions but what he accomplished was confined purely to the application of mechanical skill involving old principles to achieve an old result and nothing was done involving the exercise of creative faculties.

█ At the time of plaintiff's alleged invention it was well-known that application of the plate current before the filament of the tube was properly heated was harmful to the tube. The form of switch used by the plaintiff was also known. When he combined his knowledge and effected the sequential operation of the filament and plate circuits by the use of the switch, he did *nothing* more than apply mechanical skill toward the attainment of a known objective. This did not rise to the height of valid patentable invention.

Plaintiff believes his position to be analogous to that of the patentee in the case of Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523. In that case the Court said: "The invention was not the mere use of a high or substantial pitch to remedy a known source of trouble. *It was the discovery of the source not before known, and the application of the remedy, for which Eibel was entitled to be rewarded in his patent.* Had the trouble which Eibel sought to remedy been the well-known difficulty of too great wetness or dryness of the web at the Dandy roll, and had he found that a higher rather than a low pitch would do that work better, a patent for this improvement might well have been attacked on the ground that he was seeking monopoly for a mere matter of degree. But that is not this case. On the other hand, if all knew that the source of the trouble Eibel was seeking to remedy was where he found it to be, and also knew that increased speed

of the stock would remedy it, doubtless it would not have been invention on his part to use the pitch of the wire to increase the speed of the stock, when such pitch had been used before to do the same thing, although for a different purpose and in a less degree." (Italics supplied) 261 U.S. at page 68, 43 S.Ct. at page 330, 67 L.Ed. 523.

█ I do not agree that this plaintiff is on a plane with the plaintiff in the Eibel case because I cannot find that he was the discoverer of "the source not known before". I believe plaintiff's case is ruled by the language of the Supreme Court in the case of Altoona Publix Theatres v. American Tri-Ergon Corp., 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005, wherein it said: "An improvement to an apparatus or method, to be patentable, must be the result of invention, and not the mere exercise of the skill of the calling or an advance plainly indicated by the prior art. Electric Cable Joint Co. v. Brooklyn Edison Co., 292 U.S. 69, 79, 80, 54 S.Ct. 586, 78 L.Ed. 1131. The inclusion of a flywheel in any form of mechanism to secure uniformity of its motion has so long been standard procedure in the field of mechanics and machine design that the use of it in the manner claimed by the present patent involved no more than the skill of the calling. See American Road-Machine Co. v. Pennock & Sharp Co., supra [164 U.S. 26, at] page 41, 17 S.Ct. 1 [41 L.Ed. 337]. Patents for devices for use both in the motion picture art and in the art of sound reproduction, notably the Holst, the Bell & Tainter, the Dragoumis patents, and the Edison application, already noted, plainly foreshadowed the use made of the flywheel in the present patent, if they did not anticipate it. The patentees brought together old elements, in a mechanism involving no new principle, to produce an old result, greater uniformity of motion. However skilfully this was done, and even though there was produced a machine of greater precision and a higher degree of motion constancy, and hence one more useful in the art, it was still the product of skill, not of invention. Hailes v. Van Wormer, 20 Wall. 353, 368, 22 L.Ed. 241; Grinnell Washing Machine Co. v. E. E. Johnson Co., 247 U. S. 426, 432-434, 38 S.Ct. 547, 62 L.Ed. 1196; Powers-Kennedy Contracting Corp. v. Concrete Mixing & Conveying Co., 282 U.S. 175, 186, 51 S.Ct. 95, 75 L.Ed. 278." 294 U.S. at page 486, 55 S.Ct. at page 458, 79 L.Ed. 1005.

In addition to the defense of invalidity the defendant contends that its 23–A and 355 E–1 transmitters do not in any event infringe upon any method suggested in plaintiff's patent. Since evidence and argument are in full in this area of the case an examination of the issue of infringement seems expedient in addition to the finding of invalidity.

Plaintiff contends that the principle involved in the manual operation of the switch as described in his patent is identical when the operation is carried on in a circuit wherein the means of heating filaments of audion and rectifier tubes and, after a proper time interval, applying high plate voltage is automatically effected. He further contends that since the same operation that is performed by the knife switch manually operated method is inherent in a method of operation by automatic means, which is merely a refinement of the method and apparatus of his patent and designed to adapt his invention to the use of circuits energized from an alternating current supply, the alleged infringing devices of the defendant fall into this classification and trespass upon his invention.

In the first of the defendant's allegedly infringing devices, the 23–A transmitter, no batteries are used. Alternating current is supplied through the main power switch which energizes the audio transformer, then the power can be supplied to the circuit through a four-position snap switch. When this switch is turned to the position in which the contacts marked "Fil" and "1" are bridged, the primaries of two transformers are both energized. The current induced in the secondary of one of the transformers heats the filament of a tube and the current induced in the secondary of the other transformer heats the filaments of two plate rectifier tubes. After a pause of thirty seconds the switch is turned to the position in which all three terminals marked "Fil", "1", and "3" are bridged. This continues to heat the filaments of the three vacuum tubes previously mentioned and establishes an additional circuit through another switch (which would be closed) to the winding of a relay. This closes the contacts of that relay which close the circuit to the primary of the plate rectifier transformer. The secondary of this transformer then supplies high alternating voltage to the plates of the rectifier device and current then flows unidirectionally and alternately between the filaments and plates of these tubes.

The defendant insists that although the snap switch is used to supply filament heating current to the amplifier tube and to the plate rectifier tubes and, after delay of thirty seconds, to supply plate current to the amplifier tube, this switch does not respond to the limitations of either claim 1 or claim 2 of plaintiff's patent. It submits that it cannot be found that this switch is actually interposed in a common leg or portion of the plate and filament circuits of the amplifier and plate rectifier tubes and that the switch only indirectly through the filament transformer connects alternating heating current to the filament of these tubes and is not in the plate circuit of any of them. It further submits that the switch merely closes the contacts of the relay, which causes alternating current to be supplied through the separate transformer to the plate circuits of the rectifier tubes which in turn supply direct current to the plate circuit of the amplifier tube. It further submits that the application of heat to the filaments of the tubes in the 23—A transmitter, although admittedly thoriated tungsten filament tubes, was not intended for the purpose of reactivating and did not reactivate these tubes. The filaments of the tubes were heated first in accordance with the established practice to prevent injury to the tubes because, as defendant says, if they are not heated first an arc may start in the tube due to the sudden shock of the applied voltage and if the tube does not burn out some other part of the circuit may be injured.

In respect of claim 2, the defendant likewise submits that there is no infringement by the 23–A transmitter because it does not have separate energizing means for the plate and filament circuits such as are specified in plaintiff's patent. The four-position switch in the 23–A transmitter, furthermore, does not have one of its contacts connected in a common leg of the plate and filament circuits as in the plaintiff's patent. For these reasons defendant seeks to exonerate its 23–A transmitter from the charge of infringement of plaintiff's patent.

Defendant's 353–E–1 transmitter is also operated without batteries from an alternating current source. It is equipped with a double pole single throw snap switch having on and off positions. By manual operation of this switch the whole transmitter system may be started in the correct sequence. Closing of this switch first applies power to the audio transformer through two

516

switches which would be closed. This immediately lights the filaments of all the amplifier and rectifier tubes by supplying alternating current to them through the transformers employed in the device. At the same time a relay is energized. This is a time delay relay which closes its contacts after approximately one minute. When the contact of this relay is closed the other relay operates to close the circuit for the bias plate rectifier transformer which furnishes plate power for the bias plate rectifier device. When current flows in the plate circuit of the bias plate rectifier, still another relay closes and supplies power to the primary transformer which energizes the plates of the intermediate plate voltage rectifier consisting of the several tubes employed. The closing of the original switch also operates a relay and supplies filament heating current to each of a number of vacuum tubes through transformers. The operation of this relay also supplies current to a relay which after a delay of forty-five seconds puts in operation the grid bias rectifier for the high power stage consisting of two tubes. By a system of closing relays a delay of five minutes is caused before there is put into operation the high voltage power rectifier.

Plaintiff reiterates his contention in the case of this transmitter as in that of the 23–A device that the filaments of the tubes are heated first in order to protect them and the circuits from injury from sudden shocks. Some of the tubes in this transmitter are thoriated tungsten tubes but there are no such tubes in the power amplifier. Again the defendant claims that its device does not infringe claim 1 of the plaintiff's invention (the only claim allegedly infringed by this device), because the switch is not interposed in a common leg of the filament or plate circuit and because its transmitter system is not operated for the purpose of reactivating the filaments of any of the tubes or for the asserted purpose of plaintiff's invention, namely, of preserving "the original condition of the tubes so that reactivation in its strictly technical sense would not be necessary".

■ Plaintiff fails to disclose in his patent any structural means for automatically delaying the plate potential until the filaments are heated. He makes his initial mistake in assuming that his patent covers the automatic means of delay to which he extends it. I cannot see how his disclosure is infringed by the devices of the defendants which carry out the teachings of the Kishpaugh patents and their knowledge of the art known long before plaintiff's invention in a manner not disclosed in the patent of the plaintiff. I find that the plaintiff has failed to prove infringement upon the part of the defendant.

Findings of fact and conclusions of law will be settled and a decree signed in favor of the defendant.