In the Matter of GENERAL TELEPHONE COMPANY OF UPSTATE NEW YORK, INC., Petitioner, v. JAMES A. LUNDY et al., Constituting the Public Service Commission of the State of New York, Respondents.

Third Department, February 2, 1965.

440

*Dewey, Ballantine, Bushby, Palmer & Wood (Everett I. Willis* and *Edward N. Sherry* of counsel), *Power, Griffith, Jones & Bell (John Robert Jones* of counsel), *Taylor, Wilkinson & Hardies (Edward L. Wilkinson* of counsel), for petitioner.

*Kent H. Brown* and *Charles R. Gibson* for respondents.

GIBSON, P. J.   The determinative issue presented upon this review of a telephone rate case is whether the Public Service Commission, in exercising its conceded right to determine the reasonableness of prices paid by petitioner to affiliates for equipment, supplies and services, properly rested its determination of unreasonableness upon its finding that the affiliates' earnings were in each case excessive, when measured by the resulting rate of return upon book equity.   Petitioner contends that the reasonableness of the prices paid by it should have been determined upon its proof that the prices charged by the affiliates were the same as, or less than those set by competing manufacturers and the same as, or less than the prices that the affiliates charged nonaffiliated telephone companies.   Petitioner contends, further, that even if the commission had power to measure the reasonableness of the prices by the affiliates' earnings, it erred in basing the rates of return, found by it to be excessive, upon historical book equity rather than upon the cost of the acquisition of the affiliates by the holding company concerned.

Petitioner sought to increase local service telephone rates in its operating territory in the State of New York by amounts calculated to yield an increase of $961,200 in its annual gross operating revenues. The respondent commission granted increases of $340,000 which it found would be sufficient to effect a yield of 6.5% on petitioner's net investment. Of the $621,200 increases denied, petitioner challenges the propriety of the disallowance of approximately $100,000, which is the aggregate of the commission's adjustments on account of transactions involving purchases by petitioner from its so-called affiliates of equipment, supplies and services. The essence of the commission's finding is that petitioner failed to sustain the burden of proving that the prices paid were reasonable, and that the showing of the affiliates' "excessive" profits indicates that the prices were unreasonably and unnecessarily high. The commission said: "Transactions between a regulated public utility and its affiliates, because of the lack of arm's length bargaining, must be the subject of close scrutiny by the Commission. If advantage has been taken of the affiliated relationship to the detriment of the utility and its subscribers, it would be neither just nor reasonable to permit the parent company to profit therefrom through the utility's rates, and this Commission has full power to prevent that result." Petitioner's brief recognizes that "transactions between affiliates are subject to scrutiny by regulatory agencies to see whether any improper advantage has been taken of the affiliated relationship"; and seeks to demonstrate the reasonableness of the prices paid.

Petitioner's common stock is owned by General Telephone and Electronics Corporation (G T & E), a holding company, with which are also affiliated, in the so-called General System, more than 30 domestic telephone operating companies, serving nearly 5,000,000 telephones in 32 States, including nearly 60,000 telephones in up-State New York. The parent, G T & E, owns all of the voting stock of Automatic Electric Company, a manufacturer of telephone equipment; and the latter company's wholly-owned sales subsidiary, Automatic Electric Sales Corporation (the two being collectively referred to as AE), sells that equipment and, in addition, distributes telephone supplies manufactured by nonaffiliated companies. The so-called Leich companies, a manufacturing company and its sales subsidiary, were once wholly-owned subsidiaries of G T & E and later merged with AE. Another affiliate, General Telephone Directory Company, owned by G T & E, compiles and prints telephone directories and sells yellow-page advertising therein.

Sales by AE to telephone companies of the General System have constituted 38% to 45% of its total sales and have represented 53% of its sales to domestic telephone companies. The Leich companies, before their 1962 merger with AE, made 80% of their total sales to General System affiliates. Affiliates in the system accounted, also, for about 80% of the business of the Directory Company, which is paid by each telephone company for publishing its telephone directory, as well as for selling and other services, a percentage of the revenue from sales of yellow-page advertising, which the Directory Company solicits in the name of the telephone company. G T & E subsidiaries purchased at least 90% of their equipment and supplies from the G T & E manufacturing and sales affiliates pursuant to a "general understanding", in the words of petitioner's economist, "that these companies were part of a family and would try to deal with each other when they could"; and the president of AE agreed that it was the policy of the G T & E system to have its domestic telephone companies purchase their requirements of equipment and supplies from AE and Leich "when possible" and when "suitable" equipment was available from them.

AE, since affiliating with the General System, has earned on that portion of its invested capital represented by common stock and surplus over 19% in its two least favorable years, over 30% in its two best years, and from 25% to 28% in other years. On the same basis of computation, the earnings of the Leich companies, while affiliated, and prior to their 1962 merger in AE, ranged from over 28% to highs of over 50% in two years, the weighted average for the period being 43%. The Directory Company's return on common equity was 36% in 1961 and 39% in 1962; and although the percentage of advertising revenues retained by the telephone companies, affiliated and nonaffiliated, increased fairly steadily from 32.3% in 1950 to 45.2% in 1962, the Directory Company's net income percentage remained about the same. The prices paid to affiliates were reflected in petitioner's rate base, in its expenses and (with respect to directory advertising revenues) in its miscellaneous operating revenues; and, on the basis of the affiliates' earnings figures, the commission made adjustments within these three categories so as to reduce the profits of affiliates included in them to an estimated level of 12% on the affiliates' common equity. As has been noted, these adjustments had the effect of disallowing about $100,000 of petitioner's proposed increase in gross revenues.

We are unable to say that the commission acted arbitrarily or unreasonably in finding that these very high profits indicated highly inflated prices which could have been materially reduced. In this situation, the commission was not, of course, constrained to give controlling effect to the proof that the prices paid were no greater than those charged by the affiliates to unaffiliated companies or those which other manufacturing and sales companies charged their customers. As was said of a demonstration of comparative prices in another case: "All of these facts * * * would be far more persuasive with respect to the propriety of the rate if the parties were independent of each other and dealing at arm's length. Where, however, they constitute but a single interest and involve the embarkation of the total capital in what is in effect one enterprise, the elements of double profit and of the reasonableness of inter-company charges must necessarily be the subject of inquiry and scrutiny before the question as to the lawfulness of the retail rate based thereon can be satisfactorily answered." (*Western Distr. Co. v. Commission*, 285 U. S. 119, 126.) Neither can we account as ill-conceived or unsubstantial the factors found by the commission to be contributory to the pricing—that, realistically, the operating company and its suppliers, all wholly-owned subsidiaries of the holding company, are, in effect, different departments of one business enterprise, so that there exists no incentive to real bargaining; and that despite the suppliers' preferred position in the integrated system, with sales of large percentages of their production in effect guaranteed, with the results of fostering volume production and, it may be assumed, cutting promotional and sales costs, there has, nevertheless, been no corresponding reduction in prices.

Nearly 35 years ago, the Supreme Court of the United States, speaking through Mr. Chief Justice HUGHES, denied conclusive effect to proof that the prices charged by a utility's manufacturing affiliate were less than those charged by other manufacturers and less, also, than the affiliate charged independent companies, and remanded the case for further findings, stating: "The point of the appellants' contention is that the Western Electric Company, through the organization and control of the American Company, occupied a special position with particular advantages in relation to the manufacture and sale of equipment to the licensees of the Bell system, including the Illinois Company, that is, that it was virtually the manufacturing department for that system, and the question is as to the net earnings of the Western Electric Company realized

in that department and the extent to which, if at all, such profit figures in the estimates upon which the charge of confiscation is predicated. We think that there should be findings upon this point." (*Smith* v. *Illinois Bell Tel. Co.,* 282 U. S. 133, 153.) Petitioner denies the applicability of the *Smith* decision, and while it is true that the language pertinent to the problem before us is to some extent dictum, it was most certainly intended to delineate the nature and scope of the inquiry and findings to be made upon remand, with particular reference (p. 153) to the extent to which, if at all, the profit of the affiliated supplier "figures in the estimates upon which the charge of confiscation is predicated". Consequently, we attach weight to the opinion if only as one guide to the proper course of our decision in this parallel case.

If the inquiry into and scrutiny of profits, recognized in *Smith* (*supra*) and again in *Western* (*supra*) as necessary and proper, do disclose the unreasonableness of the intercompany charges, despite comparable charges by others, the corollary right of the commission to make proper adjustment is self-evident, unless that right of scrutiny is to give rise to nothing more than an exercise in futility. The issue is not the right of a supplier to charge a particular price or the right of its customer to pay it, but, rather, the right of the commission to enforce the paramount public interest in a rate that shall not reflect inflated costs. That the commission's determination is thus in pursuance of its proper function, and is not a rate-fixing process applied to nonutilities, seems too clear to require discussion; and we find petitioner's contention to the contrary, and its reliance upon authorities clearly inapposite, alike unfounded.

We are unable to appraise as arbitrary or unreasonable the basis upon which the commission computed the affiliates' respective percentages of profit, that is, upon historical book costs, rather than upon the costs of the acquisition of the affiliate AE, particularly when, as seems tacitly to be conceded, the purchase price reflected the very earnings and profits examined in this case and found to be excessive. True, as petitioner contends, the vendors of the outstanding interests were not obliged to sell at a price which should not give effect to prospective earnings at the level of those compiled in the past or reflect an evaluation of present good will, however doubtful its advantage and value after 100% ownership and affiliation; but, on the other hand, there was no warrant for an assumption by G T & E, when it paid for such considerations, that the excessive prices necessary to continued extraordinary

profits would not be taken into account in fixing rates for its subsidiary utility, with consequent effect upon its investment therein.

Neither in those of petitioner's contentions which we have treated nor in those which it seems unnecessary to discuss, do we find a substantial basis for interference with the determination; and we account it neither arbitrary nor unreasonable.

The determination should be confirmed, with $75 costs.

HERLIHY, REYNOLDS, TAYLOR and AULISI, JJ., concur.

Determination confirmed, with $75 costs.